Filed 5/18/22  P. v. Avendano CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANGEL ANTONIO AVENDANO et al.,<br><br>Defendants and Appellants. | F079411<br><br>(Super. Ct. Nos. BF167017A, BF167017B, BF167017C)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Eric Bradshaw, Judge.

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant Angel Antonio Avendano.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant Lizeth Yesenia Aldaco.

Jyoti Meera Malik, under appointment by the Court of Appeal, for Defendant and Appellant Miguel Aldaco.

Xavier Becerra and Rob Bonta, Attorneys General, Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P.

Farrell, Assistant Attorney General, Darren K. Indermill, Carlos A. Martinez, and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendants Angel Antonio Avendano, Lizeth Yesenia Aldaco (Lizeth), and Miguel Aldaco (Miguel) (collectively, defendants) were each charged with unlawful transportation of a controlled substance (Health & Saf. Code, § 11379, subd. (a) [count 1]), open carry of a loaded firearm by a nonregistered owner (Pen. Code,[1] § 25850, subds. (a), (c)(6) [count 4]), and unlawful possession of a controlled substance for sale (Health & Saf. Code, § 11378 [count 5]).  Lizeth was separately charged with unlawful possession of a firearm under the age of 30 by an individual previously adjudged a ward of the juvenile court (§ 29820 [count 2]).  Miguel was separately charged with unlawful possession of a firearm by a convicted felon (§ 29800, subd. (a)(1) [count 3]).  The information further alleged that defendants committed the offenses underlying counts 1 and 5 for the benefit of or in association with a criminal street gang, i.e., the Loma Bakers (§ 186.22, former subd. (b)(1)), and while personally armed with a firearm (§ 12022, subd. (c)).  The prosecution theorized that defendants conspired to commit the charged offenses for the benefit of the Loma Bakers.

Following trial, the jury found defendants guilty as charged and found true all special allegations.  Avendano received an aggregate sentence of nine years (a three-year middle term on count 1 plus three years for the gang enhancement and three years for the firearm enhancement).  Miguel received an aggregate sentence of 10 years (a three-year middle term on count 1 plus three years for the gang enhancement and four years for the firearm enhancement).  With regard to Lizeth, the trial court imposed an aggregate

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

2.

sentence of nine years (a three-year middle term on count 1 plus three years for the gang enhancement and three years for the firearm enhancement); suspended execution of said sentence; and placed her on formal probation for three years. Each defendant filed a notice of appeal.

In his opening brief, Avendano contends: (1) the trial court erroneously denied his suppression motion; (2) substantial evidence did not support his convictions; (3) the court erroneously denied his motion for new trial based on *Brady*[2] error and newly discovered evidence; and (4) the cumulative effect of the purported errors deprived him of due process.

In her opening brief, Lizeth contends: (1) the trial court erroneously denied her suppression motion; (2) substantial evidence did not support her convictions; (3) substantial evidence did not support the gang enhancement finding; (4) the court erroneously denied her motion for new trial based on *Brady* error and newly discovered evidence; and (5) the cumulative effect of the purported errors deprived her of due process.

In his opening brief, Miguel contends: (1) the court's refusal to redact or exclude a recording of a jail call between Avendano and Lizeth contravened *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*); (2) the admission of Avendano's out-of-court statements to police officers regarding his gang affiliation also contravened *Bruton*; (3) the prosecution's failure to disclose information about social media posts violated the reciprocal discovery law (§ 1054 et seq.) and "entic[ed] defense counsel to elicit highly prejudicial evidence" about his gang affiliation "that would not otherwise have been introduced during trial"; (4) the prosecution's expert "improperly and repeatedly expressed an opinion on [his] guilt"; and (5) the cumulative effect of the purported errors deprived him of due process. In a supplemental brief, Miguel further contends:

---

[2] *Brady v. Maryland* (1963) 373 U.S. 83.

3.

(1) substantial evidence did not support his convictions; and (2) substantial evidence did not support the gang enhancement finding.[3]

With respect to the aforementioned arguments, we conclude: (1) the trial court properly denied Avendano and Lizeth's suppression motion; (2) *Bruton* did not apply to the statements challenged by Miguel; (3) substantial evidence supported defendants' convictions; (4) substantial evidence supported the gang enhancement findings; (5) the prosecution's failure to comply with the reciprocal discovery law did not amount to prejudicial error; (6) assuming arguendo that the prosecution's expert improperly expressed an opinion on Miguel's guilt, the alleged error was not prejudicial; (7) the court properly denied Avendano's and Lizeth's new trial motions; and (8) there was no cumulative error.

Each defendant also filed a supplemental brief regarding the impact of Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill No. 333), which recently amended section 186.22 and added section 1109 (Stats. 2021, ch. 699, §§ 3, 5). In view of these amendments, defendants contend: (1) they are entitled to a new trial on the charged offenses and enhancements; or (2) the gang enhancements must be vacated.[4] We

---

[3] In his opening brief, Avendano "joins in the opening and reply briefs of his co-defendants, to the extent they apply to him." In his reply brief, he "joins in the reply briefs of his co-defendants, to the extent they apply to him."

In her opening and reply briefs, Lizeth "incorporates by reference the arguments, points, and authorities set forth in the opening briefs filed in this appeal by co-appellants Avendano and Miguel to the extent they are applicable to her and accrue to her benefit."

In his opening and reply briefs, Miguel "incorporates by reference the arguments, points, and authorities set forth in the opening briefs filed in this appeal by co-appellants [Avendano] and Lizeth to the extent they are applicable to him and accrue to his benefit."

[4] In his supplemental brief, Avendano "joins in the supplemental briefs of his co-appellants, which obviously apply equally to him, just as he has joined in their previous briefs."

In her supplemental brief, Lizeth "adopts by reference the arguments, points, and authorities of co-appellants regarding the applicability/impact of AB 333 to the

conclude the gang enhancements on counts 1 and 5 must be vacated, but the prosecution may elect to retry them on remand.

**STATEMENT OF FACTS**

## I.     Stipulations

During trial, the parties stipulated:  (1) the Loma Bakers are a criminal street gang pursuant to section 186.22; (2) on January 25, 2017, Lizeth was prohibited from possessing a firearm pursuant to section 29820; and (3) on January 25, 2017, Miguel was prohibited from possessing a firearm pursuant to section 29800, subdivision (a)(1).

## II.     Prosecution's case-in-chief

### a.  *Testimony of Sergeant Eddy*

On January 25, 2017, at approximately 1:00 a.m., Sergeant Eddy of the Bakersfield Police Department was driving his patrol vehicle westbound on Columbus Street when he saw a white "90's model" Honda Accord heading eastbound.  As the two cars were passing each other, Avendano—the driver of the Accord—"crane[d] [his] neck" and gave Eddy a "long look."  This conspicuous behavior, as well as his knowledge that "90's model Hondas are a very commonly stolen vehicle," compelled Eddy to turn around and follow the Accord.  Thereafter, he observed "some movement going on within the vehicle."  At some point, Avendano "was looking at [Eddy] in the rearview mirror."

Eventually, the Accord came to a stop at the intersection of Alta Vista Drive and Columbus Street.  "About three quarters of [the] car was in the intersection" and its "rear tires were about where the limit line [was]."  Eddy "activated [the] overhead emergency

---

enhancements and convictions in this case to the extent they accrue to her benefit." (Boldface & some capitalization omitted.)

In his second supplemental brief, Miguel "adopts by reference the arguments, points, and authorities of co-appellants regarding the applicability/impact of AB 333 to the enhancements and convictions in this case to the extent they accrue to his benefit." (Some capitalization omitted.)

5.

lights" and pulled over the Accord in "a well-lit area." He observed "the occupants in the vehicle . . . moving around." In particular, Avendano "was looking at [Eddy] in the side mirror and then appearing to be turning around and . . . hav[ing] a conversation with somebody . . . ." Eddy exited his vehicle and ordered Avendano to "roll down the back window of the vehicle" and "everybody in the vehicle to put their hands where [he] could see them." Avendano and his two passengers—his girlfriend Lizeth and her brother Miguel—complied. Lizeth was sitting in the front passenger seat while Miguel was sitting in the rear.

Eddy asked Avendano for his driver's license. Avendano stated that "he didn't have one" and was driving because Lizeth, the Accord's owner, "wasn't feeling well." Eddy, who "used to be a gang officer," noticed Avendano's tattoos and thought that he "potentially was a member of a gang." After Officer Poteete arrived, Eddy informed her that Avendano was unlicensed and a records check showed "numerous prior gang contacts." He also advised her that he would "remove everyone from the [Accord]" so she could "conduct a search of the vehicle prior to impounding it."

b. *Testimony of Officer Poteete*

Officer Poteete of the Bakersfield Police Department conducted a search of the Accord after Avendano, Lizeth, and Miguel were taken out of the vehicle. She found a backpack "on the floorboard in between the back passenger's seat and the backseat of the front passenger." Inside, there were (1) two containers with "clear plastic bags fil[l]ed with methamphetamine" weighing 4.5 and 11 grams, respectively; (2) a loaded 0.9-millimeter firearm; (3) a black digital scale with an "off-white crystalline substance residue on the front of it"; (4) a "clear, plastic Baggie containing about 0.35 grams of methamphetamine"; and (5) $74.47 in currency (three $20 bills, one $10 bill, four $1

bills, and some coins).[5] Poteete subsequently searched Lizeth's person and seized five $1 bills.

At trial, in response to a hypothetical question, Poteete opined that occupants of a vehicle − in which a backpack is found containing nearly 15 grams of methamphetamine, approximately $74 in cash, and a scale − possessed methamphetamine "for the purpose of sales."  She explained:

> "Usually in sales cases, subjects will have a scale.  That way they can weigh out the specific amounts that they can then bag into personalized Baggies . . . to sell.  [¶] . . . [¶]  [Without a scale,] they wouldn't have the exact amount, and they wouldn't be able to tell the [customer] that this is the exact amount and then charge them for that specific amount.  [¶] . . . [¶] . . . Typically, when weighing the methamphetamine, they will just weigh it directly on the scale.  And that will cause the residue to stick to the scale.  [¶] . . . [¶]
>
> ". . . When subjects are selling methamphetamine, they will carry currency on them.  Obviously, they will be receiving it from the [customer] who is purchasing the methamphetamine, but they will also want to carry certain amounts on them to give them back money for whatever they might owe them.  [¶] . . . [¶]
>
> ". . . Typically, personal use . . . was the small amount, the 0.05 to 0.2 grams.  This was about 15.5 grams, which constitutes well over the one hundred uses per personal use.  And that amount would be well over $1,000, $2,000 worth of methamphetamine.  [¶] . . . [¶]
>
> ". . . [F]or personal use, subjects will carry the 0.05 to 0.2 grams.  And, typically, they will carry on them a methamphetamine smoking pipe.  Usually, those who are carrying [methamphetamine] for the purpose of sales, they will carry on them digital scales, currency in different amounts, clear plastic Baggies in which they would be able to place smaller amounts of methamphetamine . . . for the purpose of sales.  And they will also carry on them a cellular phone to use to facilitate certain transactions . . . .  And they will also carry on them a weapon of some sort, and typically it will be

---

[5] At trial, Poteete could not recall whether she found a tablet computer in the backpack.  On several occasions, however, counsel on both sides raised questions suggesting that such an item was retrieved.

a firearm, in order to protect themselves when doing these types of transactions. [¶] . . . [¶]

". . . Just due to the high amount of methamphetamine that they were carrying, it was thousands of dollars of methamphetamine.[6]  And subjects who use for personal use do not, typically, carry that amount on them."

c. *Testimony of Officer Barrier*

Officer Barrier of the Bakersfield Police Department arrived on the scene after Poteete.  He catalogued the items retrieved from the backpack.  These included the methamphetamine, the firearm, currency, a gold watch, black gloves, and a cell phone.  Barrier searched Miguel's person and seized a Houston Astros baseball cap, a $10 bill, and an empty "clear plastic Baggie."  A records check on the firearm confirmed that neither Avendano, Lizeth, nor Miguel was the registered owner thereof.  No forensic tests were performed on the cell phone.

Barrier photographed Avendano's numerous tattoos, including the word "Hillside" the letter "P" and on his right cheek; the letter "H" below his right ear; the word "Hillside" and the letters "LB" on his chest; the letters "LB" and the number "100" on his right wrist; and the letter "L" on his left leg.  He also photographed a tattoo of the word "Lomero" on Miguel's chest.

d. *Jail call*

On or around January 29, 2017, Avendano called Lizeth from jail.  The following colloquy transpired:

"LIZETH . . . :      You miss me?

"AVENDANO:      Hell yeah.  I've been having nightmares without you.

"LIZETH . . . :      . . . . Shut the fuck up, no you don't.

"AVENDANO:      On the hood, I be scared like a motherfucker.

---

[6] Poteete testified that the price of methamphetamine is $40 per gram.

"LIZETH . . . :  (unintelligible) being gay, corndog, hey even Jokes said that um, you have this stupid as fuck, like you guys should have did what I told you guys to do.

"AVENDANO:  When.

"LIZETH . . . :  When we got pulled over.

"AVENDANO:  What, what were we supposed to do?

"LIZETH . . . :  When the cop got off you should've smashed off, 'cause it was only one cop.

"AVENDANO:  Oh, I, I don't, we we're thinking about your safety, cause we were like, about you, and we got no gas.

"LIZETH . . . :  You were thinking about your safety.

"AVENDANO:  And no gas, we were going to go, where were we going to go with no gas?

"LIZETH . . . :  (unintelligible).  With no gas, you could've hit the alley right there, by 7Eleven.

"AVENDANO:  I now (unintelligible).

"LIZETH . . . :  And could do it."[7]

e.  *Prior encounters with law enforcement*

Officer Barajas of the Bakersfield Police Department's gang unit testified that his duties included "investigating gang-related crimes" as well as making "consensual contacts."  As to the latter, he explained:

"[W]e are basically just driving around different parts of Bakersfield, most of the time on the east side of town, which is where most of the gangs have their territories in.  And we go to different territories around Bakersfield.  And we just drive around.  And we just go and talk to people walking around, on their bikes, and do car stops.

"Some of them we do enforcement action.  Some of them we do no enforcement action.  Sometimes we document it; sometimes we don't.  We

---

[7] The jury listened to an audio recording of the call.

9.

have paperwork that's referred to as street checks. And we also have general offense reports.

"And sometimes we can use probable cause to stop somebody. Or sometimes we can just go and consensually talk to somebody like a normal conversation."

On August 19, 2015, Barajas conducted a non-investigatory "street check" of a group of people at a park. The group included Miguel and Salvador Soliz. Ten days earlier, Barajas contacted Soliz, who was wearing "a black flat bill hat" with the words "Gage Street" written in "royal blue lettering" "on the underside of the bill" and had "Gage Street" tattooed on his stomach. Based on his training and experience, Barajas concluded that Soliz was a member of the Gage Street subset of the Loma Bakers.

On May 1, 2016, at approximately 10:00 p.m., Officer Romero of the Bakersfield Police Department's gang unit was on patrol when he saw Avendano walking in the middle of the street and noticed a tattoo of the letter "P" on his right cheek. After ordering Avendano to get off the road, Romero asked him if he "was . . . affiliated with any gangs in Bakersfield." Avendano admitted that "he was a member of the Loma Bakers" ever since he "got jumped in when he was approximately 12 years old." He "had been 'putting in work' " such as "tagging and spray painting on the wall" and "stealing vehicles" to "climb up the ladder in the gang world." Avendano then mentioned that he knew Romero was "a gang cop" and Romero "should have known of him."

On June 9, 2016, at approximately 3:00 p.m., Officer Martinez of the Bakersfield Police Department pulled over a vehicle driven by Miguel. Martinez noticed that one of the passengers, Avendano, sported several tattoos: the letter "H" on the right side of the neck, the letters "LB" and the word "Hillside" on his chest, and the letter "L" on his lower left calf.

On December 10, 2016, at approximately 7:40 p.m., Officer James of the Bakersfield Police Department pulled over a vehicle driven by Avendano. James noticed

10.

that Avendano sported several tattoos: the word "Hillside" on the right cheek, the letter "H" below his right ear, the letter "B" on his left hand, and the letters "LB" on his right wrist. When asked about his tattoos, Avendano explained that "the B on his hand [was] for Bakers, and the LB on his wrist was for Loma Bakers." He then stated that "he was an active member of the Loma Bakers" and "was still putting in work."

#### f. *Testimony of Officer Jones*

Officer Jones of the Bakersfield Police Department's gang unit was the prosecution's gang expert.[8] At the time of trial, he had been a police officer for seven years and a gang officer for nine months.

##### i. Jones's qualifications

When Jones was at the police academy, he received 40 hours of instruction on "local gangs as well as gang culture in general" and "rode with" gang officers as part of his field training. As a patrol officer for "six and a half years or so," he "respond[ed] to calls-for-service involving specific gang offenses." Jones contacted members of "traditional Black and traditional Hispanic gangs" at least "once per week" "on the street, whether it be a subject stop[ or] vehicle stop," or "just in the neighborhood" as an "[un]official law enforcement type of contact." He also "talked with their loved ones" and other "community members" "about gang activity in their neighborhoods." After joining the gang unit, Jones "lived and breathed gangs." He continued to contact gang members on a regular basis as well as conducted wiretaps, monitored social media, and performed probation and parole searches. Jones averred that he participated in "over 1000" gang-related investigations over the course of his employment, "[m]ore than 20" of which involved the Loma Bakers.

---

**8** The record indicates that the prosecution originally intended to call Romero as its gang expert.

11.

## ii. Background on the Mexican Mafia and Sureños

Jones testified that the Mexican Mafia—also known as La Eme—is a prison gang and the "overarching controlling body of all . . . traditionally Southern California Hispanic gangs." "Underneath [the Mexican Mafia] . . . [is] this large umbrella known as the Sure[ñ]os," which means "southerners" in Spanish. "Sure[ñ]os are the foot soldiers for La Eme" and "comprised of . . . every southern California Hispanic gang, which includes Kern County and Bakersfield gangs." They identify with the color blue and the number 13, the latter because the 13th letter of the alphabet ("M") stands for the Mexican Mafia. Jones specified other ways that Sureños exhibit the number:

> "Thirteen is very commonly written with an X. X-3, and again, X is the Roman numeral for 10, so 13. Another way that 13 is often depicted is invoking Aztec numerical identifiers. So in the Aztec culture, which again is very important to Mexican nationals and people that have Mexican Heritage, they use what is called a kanpol . . . . And a kanpol consist[s] of a flat horizontal line and that is representative of five in Aztec numerics, they place another horizontal line, so now you have two fives and then three dots. Each would represent one, so two fives and three make 13. [¶] . . . [¶]
>
> ". . . One [symbol] in particular that is popular right now is for anyone who is familiar with social media or texting and emoji, there's an emoji that has the 100 emoji. . . . It's kind of a slanted 100 written usually in red with two lines underneath it. That's been adopted as kind of a modern way of writing the kanpol. So people oftentimes or gang members I should say that have the 100 logo or that emoji on them it's representative of a kanpol usually."

Sureños have "traditional rules that have been handed down over the decades that govern how . . . they act and things that they are allowed to do and not do." For instance, "if firearms are present, specifically, in a vehicle or on a person and any other gang members are present, they are to let them know that they are in possession of that gun." Jones explained:

> "[T]he reason why – because of the severity, especially, . . . in [the] State of California for illegally possessing a gun, if you are contacted by law enforcement you need to know how to act. So if one person is holding the

12.

gun, obviously, they'll take the rap for that.  But it may be in a spot where it's lying around, it may not be exactly in their possession, they may drop it and so it could get pinned on other people.

"Now, the reason you are supposed to let other people know that is so that they know what it is they should do in this event.  One option is to simply run, try and get away from police.  Another option is that if they can take it, if it's a younger homie, somebody who is less experienced in the gang and doesn't have the same rep as the more veteran gang member who may be in possession of that g[un], they are expected to take that rap for the gun so the veteran can stay out, and that's how the younger person will build status.

"Another reason too is if a rival gang member comes around while somebody is in possession of a gun now they know, hey, I'm okay, this is where it is, this is where I need to go for protection.  I can grab it if I need to use it.  It's fair game for anybody.  While only certain people have the status to hold them, anybody can use them if it comes time to use it."

### iii.  Background on the Loma Bakers

The Loma Bakers are a Sureño gang in Bakersfield comprised of various subsets, including the Hillside Primos, Hillside Locos, Los Primos, Gage Street, and Water Street. The "traditional boundaries" of the gang's territory are "Columbus Street to the north, Union [Avenue] to the west, East California [Avenue] to the south and Mount Vernon [Avenue] to the east."  Jones was well acquainted with the area, having spent "10 percent of [his] time" as a patrol officer and "close to a third of [his] working time" as a gang officer there.  Notably, Columbus Street constitutes the southern border of territory claimed by the Uptown Bakers, a "young upstart" and "particularly violent" rival Sureño gang.

Generally, one is recruited into the Loma Bakers in one of two ways:  (1) the person "simply grow[s] up in the neighborhood that's around and . . . [is] incorporated into the gang"; or (2) the person is "jumped in," i.e., attacked by at least three to five gang members for up to five minutes.  There are approximately 100 Loma Baker members, mostly men and ranging between ages 12 and 55.  The initials "LB" and "LBKS" and the word "Loma" are the most common tattoos sported by members.  In the

past, Jones has seen the word "Lomero," which means "one who is of the Loma," tattooed on at least two known Loma Bakers. Database records showed that other officers documented a "Lomero" "tattoo or writing of some kind" eight times since 2005; by contrast, the word "Loma" and the initials "LB" were documented at least 63 times over the same time period. In addition, members commonly bear letters and symbols representing one or more subsets, Jones elaborated:

> "For Hillside the letter H is important to them, obviously, because it begins Hillside. By that extension, tattoos of just H or HS, Hillside or even the Hillside Primos cli[que] would be HSP. Any sports memorabilia with the H prominently featured, which can be, example, Houston Astro[s], Hawaii, Houston Texans, any sort of memorabilia that would be representative of Hillside. [¶] . . . [¶] . . . For Gage Street, one that is really popular is the Green Bay Packers logo because it is a very prominent G. . . ."

Jones emphasized that he never met a non-gang member who had gang-related tattoos:

> "If somebody were to hold themselves out to be a member of a particular gang, [there] would be severe repercussions. I certainly wouldn't want to be them. They would be subject to probably [at a] minimum a severe beating by other gang members, they could even be possibly killed depending on the circumstances that they held themselves out to be a gang member. [¶] . . . [¶]

> ". . . [T]attoos are permanent as we all know. In my opinion, it's a serious commitment that you are marking yourself branding yourself with something. And specifically something so highly personal and well structured and has a deep meaning to, so many people such as these gangs and membership of these gangs, it would be absolutely crazy for you to put something like that that holds so much meaning and you're not part of it. You didn't earn your way in it and you are risking your life for such a thing."

According to Jones, respect and loyalty are "the two biggest factors of importance to a gang member." He testified:

> "The loyalty is, of course, your gang and those that are close to you, your family and really the gang is considered their family. I have been told that many times, but respect is important as well because it's twofold. One, you

14.

have respect from within the gang, how you earn respect is by how you carry yourself, the actions you take for or on behalf of the gang, building that reputation, being a good worker, so-to-speak, for the gang that will earn you respect. It will bolster your reputation within the gang and people within that gang will know who you are. They will say, hey, that guy is a good guy. He's somebody I can trust. He's somebody I can rely on if I need to for something that I want to do. The other side of that is it garners respect from the community. Now, that respect is not, in my opinion, something that is noble. What it's usually referring to is fear, that respect is earned through fear from the community. They fear gang members by committing certain acts, by committing certain violations of the law. By simply being around interacting with the community in these negative ways whether it be flashing gang signs, tagging things on wall[s] that belong to people, stealing their property, fighting or assaulting them, any number of things, those all garner fear from the community, which in turn is viewed as respect from the community. And what that allows them to do is further this criminal enterprise because they know that . . . the more respect that they have from the community the more they can get away with because they're not going to be told on or testified against. [¶] . . . [¶]

". . . [T]he respect I'm talking about is this trustworthiness and holding them in higher view that this is somebody who is willing to get the job done. And when I'm talking about jobs, I'm talking about illegal acts, whether it be burglarizing someone, stealing their car, shooting, stabbing, robbing anybody including rival gang members or just normal citizens. That respect is important because as a gang member if I entrust this person who I believe to be my fellow gang member or even my brother in that sense, if I can't trust them then why would I put myself in this dangerous position? One, where the crime could go back on me and I get attacked somehow, do I want to rely on somebody I know who is going to run away when the time is tough? And likewise when the police com[e] looking for me, is this somebody I can trust to be quiet about what is happening, is not going [to] brag to everybody, is not going to tell when the police come and talk to them or when in fact they find out that that person was involved in the crime they're not going [to] tell on me and flip on me. So that's why respect is important and that's why it's wanted because it shows that you are loyal to them and it boost[s] your reputation within the gang. [¶] . . . [¶]

". . . If a normal non-gang member commits a crime, let's say, a robbery against a citizen that person would be in fear of that person, obviously. They might even be in fear of where that location happened. If it was at night they might even be fearful of going out at night anymore because of the chance that this can occur again. If that same suspect

commits the robbery while invoking, let's say, Loma as they are doing this robbery now that person is definitely going to remember who that person is, where they were, what time of day it was and they're also going to remember who Loma was. And anybody that represents Loma or they suspect might [be] a Loma member they are going to be in utter fear and never want [to] be around anybody ever like that again or be around the area where any Loma gang member might be. In fact, it creates a wider fear of this gang and it spreads throughout the community. You know as a victim of crime you are going to tell everybody what happened. And if it involves a gang you know for sure they are going to be telling them that it was gang-related and who they were, so in that sense it creates this ripple effect through the community. [¶] . . . [¶]

". . . [Loma Bakers] can shout Loma [to invoke the gang] . . . . They can wear the same gear such as wearing an H on their hat, wearing an LB on their hat, something that represents the gang, by showing their tattoos so that they are prominent when this crime occurs or by even flashing gang signs when the crime occurs. [¶] . . . [¶]

". . . Whenever a subject puts in work for the gang, they are bolstering their reputation, gaining that respect through . . . [il]legal acts, you wouldn't rely on somebody who claims to be a gang member yet they just sit on the sidelines all day and do nothing, they are not doing a whole lot for the gang. So what you are going to do is respect this person more, increase this person's reputation who is out there committing these crimes on behalf of the gang, which by itself will instill this fear into the community, will bolster the reputation through this word-of-mouth and even the way media broadcast news, but also a lot of these ventures will make money for the gang which in turn builds that power, and builds that respect. So, again, as you are committing these crimes you are earning more respect and getting more juice as it were."

The primary activities of the Loma Bakers include drug sales, illegal firearm possessions, shootings, murders, robberies, auto thefts, and burglaries. Gang members frequently commit the crimes together. First, "[there] is the safety in numbers . . . ." Second, "[there is] the camaraderie factor," i.e., "where one person is building this relationship with this other gang member, is witnessing them put in work and can attest to that at a later time, if need be, to more senior gang members, or just other people in general that are involved in the gang, and by virtue of being with somebody who has a

16.

very public branding of their gang association, and the other person is known to be a gang member, as well, it falls onto them, as well."

Regarding drug sales, Jones testified:

> "So drug sales benefits [*sic*] the gang in the same way it probably benefits any other person. You are engaging in this criminal enterprise where you are essentially opening up a business. You have goods and you're wanting to sell it to other people. As a gang member whenever you get those proceeds from your sales, that money doesn't go to you. It's going to go to the gang itself. It will go up the chain, to the leader, you know, in some form or fashion where you are getting taxed. And then that money will then be redistributed throughout the gang as needed. Oftentimes, those proceeds of those drug sales will go towards buying more drugs, buying weapons through typically legal means, however, it can be done in an illegal fashion and also bailing out fellow gang members."

Regarding unlawful firearm possessions, Jones testified:

> "So the mere possession of a firearm by a gang member it helps the gang because if anybody were to know [about] or see . . . this person in possession of a gun automatically there is fear. Especially if they know this person is a gang member, they know they shouldn't have that and they know they are in possession of it for an illegal purpose. They are either going to attack somebody with, which is often the case, or they're not allowed to possess it to begin with by virtue of them being a gang member or as often as common they're simply prohibited because of prior convictions of some sort. So this fear is automatically given to the person and again in turn respect."

Jones also pointed out that gang members who sell drugs often possess firearms:

> "The main purpose of a gun in association with the drug trade is that you as a gang member have this enterprise you can try and defend it with just your hands and feet or maybe even calling more people to help you defend it, but all it would really take is one other gun or rather one gun to come at you and that would end it pretty quickly. So what do you do? You get yourself a gun as well. That way you can defend [against] anybody who may attack you. You can also use it against somebody else to instill that fear. . . . [¶] . . . [¶] . . . If you see them on your turf they are trying to cut in on your business or even just the simple respect aspect. You can't be out here. This is my place and so you can chase them off by merely flashing the gun or even shooting at them. Also, we can't forget the fact that unfortunately

17.

sometimes police officers contact these gang members and interrupt or disrupt this operation with the drug trade unfortunately we are shot at by gang members because of this."

### iv. Indicia of possession of methamphetamine for sale

Jones has participated in over 50 investigations related to possession of a controlled substance for sale; 20 of those cases involved methamphetamine. He has also testified as an expert on drug sales over 20 times. In determining whether an individual possesses methamphetamine for sale, Jones considers multiple factors, including the amount of the drug; the presence of packaging, scales, and/or money; and, if applicable, the number of packages.

In the instant case, Jones found multiple indicia of possession of methamphetamine for sale. First, the amount of methamphetamine was "substantial" and "nowhere even close to being reasonable for personal use." Second, the drugs were "individually bagged into three separate quantities." Third, the "bags" were made from "Saran Wrap," a "cheap," "very thin material" that "stretches easily," "can be transported easily," and "can create many packages at one time." Fourth, the digital scale had "white residue," indicating that it was used "to weigh methamphetamine." Fifth, the currency consisted of "a few singles," which "coincide[d]" with the value of the methamphetamine recovered.[9] Finally, the gold watch was "an item of value that . . . can commonly be traded for drugs . . . ."

### v. Opinion on defendants' affiliation with the Loma Bakers

Based on the totality of the circumstances, Jones opined that Avendano was an active member of the Loma Bakers at the time of the January 25, 2017 incident. He had been "driving on the edge of [gang] territory that's disputed amongst both the Loma

---

[9] In contrast to Poteete (see *ante*, fn. 6), Jones testified that "the price [of methamphetamine] has dropped a good bit" and a gram of methamphetamine costs "between $5 and $15" depending on the circumstances." He estimated that the value of the methamphetamine found in the Accord ranged between $150 and $300.

Bakers and the Uptown Bakers" with "a sales quantity of methamphetamine," "a loaded handgun," and "other gang members," which was consistent Loma Baker behavior. Avendano bears numerous gang-related tattoos, including the letter "L" for "Loma"; the letter "B" for "Bakers"; the initials "LB" for "Loma Bakers"; the letter "B" "written in a format that can be viewed as a 13" as well as the number "100," both of which demonstrated "allegiance to the Sureño gang" and "by extension La Eme"; the letter "H" for "Hillside"; the initials "HS," which also stood for "Hillside"; the word "Hillside" and an adjacent letter "P" for "Hillside Primos"; and the initials "HSL" for "Hillside Locos." Based on a comparison between the photographs taken by Barrier (see *ante*, at p. 8) and those taken by Jones in March 2019, many of the tattoos were "filled in," "worked on," or added after the January 25, 2017 incident, which was "indicative of continuing membership . . . within the gang." During the jail call with Lizeth, Avendano said "[o]n the hood," "a common expression used by many gang members, including Loma Bakers," to mean "I promise on the gang," i.e., "what I'm saying is true." Finally, in prior encounters with police, Avendano admitted that he "is part of the gang," "display[ed] [the] tattoos," "explain[ed] . . . what those tattoos mean," and/or was in the company of other gang members.

Based on the totality of the circumstances, Jones opined that Miguel was an active member of the Loma Bakers at the time of the January 25, 2017 incident. He had been with Avendano "on a dangerous mission . . . selling drugs . . . on the edge of disputed gang territory." Also, Miguel had worn a Houston Astros baseball cap with a "prominently featured H," which was "indicative of the Hillside subset." He bears a "very large and prominent [chest] tattoo" of the word "Lomero," which demonstrated that he was "a Loma Baker gang member." A closer inspection of that tattoo revealed the number "1" "just inside the angle of the L" and the number "3" "inside of the O next to it," "form[ing] 13 for the Sureños and La Eme." Finally, in prior encounters with police, Miguel was in the company of other gang members.

Based on the totality of the circumstances, Jones opined that Lizeth was a member of the Loma Bakers at the time of the January 25, 2017 incident. She had been "riding around in a vehicle with [Avendano and Miguel] doing gang crimes." Given that Lizeth "is in an intimate dating relationship" with Avendano and is Miguel's sister, Jones could not imagine that "she would not have any knowledge of what [the Loma Bakers] is and what her . . . brother and . . . dating partner are involved in and how much they are involved in." During the jail call with Avendano, Lizeth "specifically t[old] . . . Avendano that he should have smashed," i.e., "gone on a pursuit with police." Jones considered this to be "an admission that she knew what was in the vehicle and was taking part of this criminal act." During the same call, Lizeth mentioned that she had spoken with Jokes, the moniker of a known Loma Baker. Jones believed that her "consulting with and relay[ing] to [Avendano] about what [Jokes] had said . . . show[ed] a clear pattern of involvement and . . . 'immersion' in this gang lifestyle, and extreme familiarity with their actions and who they are." Finally, in 2019, Jones visited Lizeth's residence and photographed graffiti on a garage wall of the word "Jokes" and the initials "HSP" for Hillside Primos. A closer inspection of "Jokes" revealed the numbers 1 and (an upside down) 3.

## III. Defense's case-in-chief

### a. *Testimony of Ace Pierce*

Pierce, a bail bondsman and private investigator, was called as a gang expert by Miguel's attorney. He testified that he "grew up off of Cottonwood Road and Highway 58" in Kern County. Pierce became familiar with gangs at a young age: he attended school and other community functions with gang members and his two older brothers were gang members. As a bail bondsman for "[a]bout 22 years" and a private investigator for "[a]bout a year and a half," Pierce came into contact with gang members "[d]aily" and openly discussed gang-related matters with them. He also came into contact with law enforcement officials "[t]hree to five times a week" and discussed topics

20.

such as gangs, gang activities, gang territories, gang tattoos, gang symbols, and current gang investigations.

Pierce developed a familiarity with the Loma Bakers by "work[ing] several investigations with Loma Bakers gang members," "bail[ing] members of Loma Bakers out," "talk[ing] to them on a regular basis," and spending "[a]t least 15 years" in Loma Baker territory. He identified the following as tattoos he has seen on members: "LB"; "Gage Street"; "Los Primos"; "Hillside"; "Loma"; and "13." By contrast, Pierce has never seen a "Lomero" tattoo. After consulting numerous sources (a "Homeland Security Gang Unit" officer, a probation officer "assigned to multiple gang units," and a Loma Bakers gang member) as well as conducting "computer research," he concluded that "Lomero" is not a Loma Bakers tattoo.

The day before Pierce testified, he stayed in the courtroom along with Jones, the prosecutor, and the defendants' attorneys after the jury was dismissed. Pierce heard Jones say, "I've been a nice guy, but now I'm going to bury their fucking client."

b. *Testimony of Jones*

Jones was recalled to the stand. He acknowledged that he made the following statement: "I was trying to be polite, but now I'm going to bury them." Jones testified that the statement was made in connection with a rhetorical question he had raised about evidentiary procedures that were performed outside the jury's presence. He denied using any profane language or having a personal vendetta against defendants and/or their attorneys. Nonetheless, Jones testified that he had apologized for the remark.

## DISCUSSION

## I. The trial court properly denied Avendano and Lizeth's suppression motion.

a. *Background*

Pursuant to section 1538.5, Avendano moved to suppress evidence obtained as a result of law enforcement's warrantless search and seizure. Lizeth joined in the motion.

21.

Later, the parties stipulated that the police conducted the vehicle search without a warrant.

A motion hearing was held on May 30, 2018. Sergeant Eddy testified that he was driving his patrol vehicle westbound on Columbus Street at approximately 1:00 a.m. on January 25, 2017, when he noticed "a white Honda" heading in the opposite direction. Avendano was driving the Accord, Lizeth was sitting in the front passenger seat, and Miguel was sitting "[b]ehind her on the passenger side." Eddy's interest was piqued because (1) Honda automobiles were "a very commonly stolen vehicle"; (2) he encountered the Accord in a "high-crime area" where vehicle thefts were common; and (3) he encountered the Accord during the "violent crime window," i.e., between "9:00 p.m. and about 3:00 a.m.," when "[t]he area is not really well lit" and most vehicle thefts and other crimes occurred. Eddy—a 17-year veteran of the police force—"worked pretty much either patrol or the Gang Unit pretty much the majority of [his] career" and was familiar with the locale, having "made numerous arrests in the area for weapons violations, narcotics violations, assault with deadly weapons, [and] stolen vehicles."

Eddy followed the Accord and "observed [Avendano] turn to look back at [the] patrol car," which "indicat[ed] to [him] that [Avendano] [wa]s concerned about [the] patrol vehicle." He also saw "some movement between [Miguel] and [Avendano]." Eventually, the Accord approached the intersection of Alta Vista Drive and Columbus Street, a four-way stop. It "rolled past the limit line" before coming to a stop. Eddy observed the moving violation and "turned on [his] overhead emergency lights to effect [a traffic] stop." He then perceived "major movements" inside the Accord that caused it to "mov[e] back and forth quite a bit." Eddy eventually pulled over the Accord.

By and large, during a traffic stop, Eddy would "walk up to about the B pillar behind the driver door" and "make contact with the [driver]." However, because of "the time" and "the location of the stop" as well as the "the movements that [he] saw," he was concerned about his safety and "ordered [Avendano, Lizeth, and Miguel] to put their

22.

hands where [he] could see them." Eddy asked Avendano for his driver's license, but Avendano "did not produce one" and "said he didn't have one." A records check confirmed that he was unlicensed. Thereafter, officers Barrier and Poteete arrived on the scene and Avendano was arrested for driving without a license. Eddy instructed Poteete to conduct an inventory search of the Accord before the vehicle was impounded. He testified that "[Bakersfield Police] Department policy requires a vehicle inventory of every impound . . . for community caretaking responsibilities" and officers "go through the vehicle to make sure there's no valuables left behind and for safekeeping purposes." Poteete searched the Accord and found a zipped backpack on the rear floorboard. She unzipped the backpack and retrieved "about a half an ounce" of methamphetamine, a loaded handgun, and some currency.

Following Eddy's testimony, the prosecutor chiefly argued that the police conducted "a valid inventory search." In the alternative, he asserted:

> "[T]here's a Michigan v. Long[10] exception, which is kind of the Terry[11] search of a vehicle based on the circumstances, which in this case, you know, 1 o'clock in the morning in the area of town that this officer is familiar with for having a lot of crime, he sees movements between the driver and the passenger in the back, enough that he saw the car actually moving as a result of this when he got closer. [¶] . . . I think that's enough to justify the vehicle search pursuant to Michigan v. Long. . . ."

The trial court subsequently denied the suppression motion. It reasoned:

> "If it's a valid inventory search, I think they can open containers, including a backpack, because of the items that could be stored in there such as jewelry.

> "I'm not sure about [the prosecution's] reference to a Terry search, but certainly it's a valid inventory search. A valid stop. A valid inventory search."

---

[10] *Michigan v. Long* (1983) 463 U.S. 1032 (*Long*).

[11] *Terry v. Ohio* (1968) 392 U.S. 1 (*Terry*).

b. *Standard of review*

"In reviewing a court's ruling on a suppression motion, '[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. . . .' [Citation.]" (*People v. Smith* (2020) 46 Cal.App.5th 375, 383 (*Smith*); see *People v. Dominguez* (1988) 201 Cal.App.3d 345, 353 ["[W]e must 'view the facts upon which the suppression motions were submitted in the light most favorable to the People, drawing therefrom all reasonable inferences in support of the trial court's order denying the motions.' "].)  " 'In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' [Citation.]" (*Smith*, *supra*, at p. 383.)  "[I]n reviewing the trial court's suppression ruling, we consider only the evidence that was presented to the trial court at the time it ruled." (*In re Arturo D.* (2002) 27 Cal.4th 60, 78, fn. 18, overruled in part by *People v. Lopez* (2019) 8 Cal.5th 353, 381.)  Moreover, " 'we consider the correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision.' [Citation.]" (*People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1360.)

c. *Analysis*

In California, "[a] defendant may move to suppress evidence on the ground that '[t]he search or seizure without a warrant was unreasonable.' " (*Smith*, *supra*, 46 Cal.App.5th at p. 382, quoting § 1538.5, subd. (a)(1)(A).)  "[I]ssues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards." (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156, fn. 8.)

"The Fourth Amendment provides '[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . .' [Citation.]  This guarantee has been incorporated into the Fourteenth Amendment to the federal Constitution and is applicable to the states.  [Citation.]"

24.

(*People v. Camacho* (2000) 23 Cal.4th 824, 829-830.)[12]  The Fourth Amendment " 'contains no provision expressly precluding the use of evidence obtained in violation of its commands' " (*Herring v. United States* (2009) 555 U.S. 135, 139), but the United States Supreme Court "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial" (*ibid.*).  The exclusionary rule prohibits not only "[t]he introduction into evidence of materials seized and observations made during an unlawful search" (*People v. Lamas* (1991) 229 Cal.App.3d 560, 568) but also "the introduction into evidence of materials and testimony which are the products or indirect results of the illegal search, the so-called 'fruit of the poisonous tree' doctrine" (*ibid.*).

"Warrantless searches 'are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.' [Citation.]"  (*Smith*, *supra*, 46 Cal.App.5th at p. 382.)  "[A]n officer effecting a traffic stop of a vehicle could constitutionally search portions of the passenger compartment of the vehicle, without a warrant, in certain circumstances."  (*People v. Bush* (2001) 88 Cal.App.4th 1048, 1051 (*Bush*), citing *Long*, *supra*, 463 U.S. 1032.)  In *Long*, the United States Supreme Court held:

> "Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect.  These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on

---

[12] "A similar guarantee against unreasonable government searches is set forth in the state Constitution [citation] but, since voter approval of Proposition 8 in June 1982, state and federal claims relating to exclusion of evidence on grounds of unreasonable search and seizure are measured by the same standard.  [Citations.]"  (*People v. Camacho*, *supra*, 23 Cal.4th at p. 830.)

'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." (*Long*, *supra*, 463 U.S. at p. 1049, fn. omitted, citing *Terry*, *supra*, 392 U.S. at p. 21; accord, *Bush*, *supra*, 88 Cal.App.4th at pp. 1051-1052.)

The record at the time of the motion hearing—viewed in the light most favorable to the prosecution—showed that defendants were traveling in the Honda Accord through a "high-crime area" at around 1:00 a.m. When Sergeant Eddy began to follow them, Avendano—the driver—"turn[ed] to look back at [the] patrol car." Shortly thereafter, Eddy perceived "some movement" between Avendano and Miguel, the backseat passenger. At the intersection of Alta Vista Drive and Columbus Street, the Accord "rolled past the limit line" before coming to a stop. Consequently, Eddy "turned on [his] overhead emergency lights to effect [a traffic] stop." (See *People v. Lomax* (2010) 49 Cal.4th 530, 564 [" 'As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.' "].) Before pulling the Accord over, Eddy observed "major movements" inside the vehicle that caused it to "mov[e] back and forth quite a bit." While he would normally "walk up to about the B pillar behind the driver door" and "make contact with the [driver]" during a traffic stop, he ordered defendants to "put their hands where [he] could see them." Eddy testified that he was concerned for his safety given (1) "the movements that [he] saw" in the Accord (cf. *People v. King* (1989) 216 Cal.App.3d 1237, 1239 [driver reached under his seat after his vehicle was pulled over by police]); (2) the location of the stop in a "high-crime area," with which he was well acquainted and where he personally "made numerous arrests . . . for weapons violations, narcotics violations, assault with deadly weapons, [and] stolen vehicles" (see *id.* at p. 1240 [" ' "The reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely." ' "]); and (3) the time of the stop, i.e., between "9:00 p.m. and about 3:00 a.m.," when the aforementioned crimes typically occurred under cover of darkness (see *People*

26.

*v. Souza* (1994) 9 Cal.4th 224, 241 ["The time of night is another pertinent factor in assessing the validity of a[n investigative] detention."]). In addition, until officers Barrier and Poteete arrived on the scene, Eddy was alone and outnumbered. (See *People v. Castaneda* (1995) 35 Cal.App.4th 1222, 1230 [officer alone with two detainees]; *People v. Limon* (1993) 17 Cal.App.4th 524, 531, 534 [two officers outnumbered by three suspects and other people in the immediate vicinity].)

In view of these specific and articulable facts, we conclude that " 'a reasonably prudent man in the [same] circumstances would be warranted in the belief that his safety or that of others was in danger' " (*Long*, *supra*, 463 U.S. at p. 1050, quoting *Terry*, *supra*, 392 U.S. at p. 27) and a search of the Accord's passenger compartment—limited to where a weapon may be placed or hidden (such as the zipped backpack on the rear floorboard)—was justified. (See *Long*, at p. 1050 ["If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should . . . discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances."].) Barrier and Poteete's arrival, defendants' removal from the Accord, and Eddy's instruction to Poteete to conduct an inventory search thereof do not compel otherwise. (See *Bush*, *supra*, 88 Cal.App.4th at p. 1052 ["The [*Long*] rule applies even where a defendant is outside his car and nominally under the control of law enforcement officers."].)[13]

## II. *Bruton* did not apply to the statements challenged by Miguel.

### a. *Background*

Citing the *Aranda*[14]/*Bruton* rule, Miguel moved in limine to exclude statements made during Avendano and Lizeth's jail call that incriminated him. In a bench brief, the

---

[13] Given our disposition on this matter, we need not address whether an inventory search was also valid.

[14] *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*).

prosecution countered that the *Aranda/Bruton* rule applied to testimonial statements and any statements made during the call were not testimonial. The trial court ultimately agreed with the prosecution and denied the motion.

On appeal, Miguel argues that the court's refusal to exclude or redact the statements made during Avendano and Lizeth's jail call "violated [hi]s confrontation clause rights." (Capitalization omitted.) Additionally, he contends that Avendano's out-of-court statements to officers Romero and James about being a gang member were inadmissible as per *Bruton*.

b. *Analysis*

"Broadly stated, the *Aranda/Bruton* rule declares that a defendant is deprived of his or her Sixth Amendment right to confront witnesses when a facially incriminating statement of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the statement only against the declarant." (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 68 (*Gallardo*); see *Bruton*, *supra*, 391 U.S. at pp. 126-137; *Aranda*, *supra*, 63 Cal.2d at pp. 528-531.)[15] "[T]he *Aranda/Bruton* doctrine is grounded exclusively in the confrontation clause and can extend no farther than the metes and bounds of the clause defined by the United States Supreme Court." (*People v. Washington* (2017) 15 Cal.App.5th 19, 29 (*Washington*).)

" 'The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." ' " (*Gallardo*, *supra*, 18 Cal.App.5th at p. 65, quoting *Crawford v. Washington* (2004) 541 U.S. 36, 42 (*Crawford*).) "For many years, the confrontation

---

[15] *Aranda*, which preceded *Bruton*, implemented a stricter rule based on the California Supreme Court's supervisory power over state rules of evidence rather than the Sixth Amendment's confrontation clause. (See *Aranda*, *supra*, 63 Cal.2d at pp. 529-530.) The enactment of Proposition 8's "Truth-in-Evidence" provision (Cal. Const., art. I, § 28, subd. (f)(2)) made *Aranda* coextensive with *Bruton*. (See *People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

clause barred the admission of any out-of-court statement admitted for its truth if the hearsay declarant was not available for cross-examination, unless the statement bore 'adequate "indicia of reliability" '—that is, unless (1) the evidence fell within a 'firmly rooted hearsay exception,' or (2) the evidence otherwise had 'particularized guarantees of trustworthiness.' [Citation.]" (*Washington*, *supra*, 15 Cal.App.5th at pp. 27-28.) "In *Crawford* . . . , the United State Supreme Court announced a new standard for determining when the confrontation clause of the Sixth Amendment prohibits the use of hearsay evidence . . . against a criminal defendant." (*People v. Cage* (2007) 40 Cal.4th 965, 969.) "It narrowed the clause's reach from *all* out-of-court statements admitted for their truth to only those out-of-court statements that qualify as 'testimonial,' but completely barred the admission of such testimonial statements—irrespective of their reliability—absent the defendant's current or prior opportunity to cross-examine the declarant." (*Washington*, *supra*, at p. 28, citing *Crawford*, *supra*, at pp. 51, 53-54; see *People v. Cortez* (2016) 63 Cal.4th 101, 129 ["[T]he high court unequivocally held 'that the confrontation clause applies *only to testimonial hearsay statements* and not to [hearsay] statements that are nontestimonial.' "].) "Although the [United States] Supreme Court has not settled on a clear definition of what makes a statement testimonial, [the California Supreme Court] ha[s] discerned two requirements. First, 'the out-of-court statement must have been made with some degree of formality or solemnity.' [Citation.] Second, the primary purpose of the statement must 'pertain[] in some fashion to a criminal prosecution.' [Citations.]" (*People v. Leon* (2015) 61 Cal.4th 569, 603, fn. omitted; see *Crawford*, *supra*, at p. 68 ["Whatever else the term ['testimonial'] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed."].)

"*Bruton* and *Aranda* . . . predate *Crawford*, which narrowed the scope of the right to confrontation to testimonial statements." (*Gallardo*, *supra*, 18 Cal.App.5th at p. 68.) "[B]ecause it is premised on the confrontation clause, ' "the *Bruton* rule, like the Confrontation Clause itself, does not apply to non-testimonial statements." ' [Citation.]" (*People v. Almeda* (2018) 19 Cal.App.5th 346, 362.)

Here, with respect to the jail call, "[t]here was nothing formalized about [Avendano] and [Lizeth]'s meandering and profane conversation." (*People v. Jefferson* (2008) 158 Cal.App.4th 830, 843.) Furthermore, any statements between the two "cannot be deemed testimonial within the meaning of *Crawford* because it was not a conversation involving an agent of the police." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1203, overruled in part by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) "[One] who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Crawford*, *supra*, 541 U.S. at p. 51.) Avendano and Lizeth "made no 'formal statement to government officers,' " "[n]o official with an agenda was asking questions and taking notes," and "[n]o government player was inserting veiled threats or subtle cues to get the goods on these two." (*People v. Jefferson*, *supra*, at p. 842.) "No prosecutorial abuse or government coercion prompted their damning words" (*id.* at p. 844): "[h]ow and what [Avendano] and [Lizeth] said was entirely up to [Avendano] and [Lizeth]" (*id.* at p. 843).

With respect to Avendano's statements to Romero about his gang affiliation, "[t]here is no evidence to suggest any of this information bore any degree of [the required] solemnity or formality . . . , or resembled in any way formal dialogue or interrogation . . . ." (*People v. Valadez* (2013) 220 Cal.App.4th 16, 35-36.) Romero saw Avendano walking in the middle of a street, ordered him to move to the side, and asked if he "was . . . affiliated with any gangs in Bakersfield" given the tattoo of the letter "P" on his right cheek. Avendano then freely divulged that he "was a member of the Loma Bakers"; "had been 'putting in work' " such as "tagging and spray painting on the wall"

30.

and "stealing vehicles"; knew Romero; and believed that Romero "should have known of him." Nothing in the record indicates that Romero's "primary purpose was to use the[se] statements in a later prosecution." (*Id.* at p. 36; see *People v. Smith* (2017) 12 Cal.App.5th 766, 787 [" 'A "formal station-house interrogation" . . . is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused.' "].) Rather, as a member of the gang unit, such information "would help him better understand and perhaps more effectively investigate gang activity." (*People v. Valadez, supra*, at p. 36.) Even assuming arguendo that Avendano's statements to Romero were testimonial, *Bruton* was still inapplicable because the statements made no mention of Miguel. (See *Gallardo, supra*, 18 Cal.App.5th at p. 68 [*Aranda/Bruton* rule concerned with "facially incriminating statement[s] of a nontestifying codefendant"]; see also *Richardson v. Marsh* (1987) 481 U.S. 200, 208-209 ["[E]vidence requiring linkage differs from evidence incriminating on its face in the practical effects which application of . . . *Bruton* . . . would produce. If limited to facially incriminating confessions, *Bruton* can be complied with by redaction . . . . If extended to confessions incriminating by connection, not only is that not possible, but it is not even possible to predict the admissibility of a confession in advance of trial."].)

Finally, assuming arguendo that Avendano's statements to James were testimonial, *Bruton* was still inapplicable because the statements (once again) made no mention of Miguel. (See *Gallardo, supra*, 18 Cal.App.5th at p. 68.)[16]

---

[16] Having decided on the merits that *Bruton* did not apply to Avendano's statements to the police, we need not address (1) the Attorney General's forfeiture claim; or (2) Miguel's ineffective-assistance-of-counsel claim, which is premised on a finding of forfeiture.

## III. Substantial evidence supported defendants' convictions.

### a. *Background*

Avendano, Lizeth, and Miguel were each convicted of unlawful transportation of a controlled substance, unlawful possession of a controlled substance for sale, and open carry of a loaded firearm by a nonregistered owner; Lizeth was convicted of unlawful possession of a firearm under the age of 30 by an individual previously adjudged a ward of the juvenile court; and Miguel was convicted of unlawful possession of a firearm by a convicted felon. According to defendants, the prosecution introduced two theories of culpability: (1) defendants "individually committed the offenses"; and (2) defendants "were part of a conspiracy and, as such, were liable for each other's acts."

### b. *Standard of review*

"To determine the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the prosecution to determine whether it contains [substantial] evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "We need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]' " (*People v. Tripp*, *supra*, at p. 955, italics omitted.) "This standard of review . . . applies to circumstantial evidence. [Citation.] If the circumstances, plus all the logical inferences the jury might have drawn from them, reasonably justify the jury's findings, our opinion that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." (*Ibid*.)

"Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis what[so]ever is there sufficient substantial evidence to support it." (*People v. Redmond, supra*, 71 Cal.2d at p. 755.) " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

c. *Analysis*

On appeal, each defendant contends that his or her convictions must be overturned because substantial evidence did not establish that he or she either (1) knew that the methamphetamine and firearm were in the backpack; or (2) conspired to commit the offenses with at least one other codefendant.

"Transportation of a controlled substance is established by carrying or conveying a usable quantity of a controlled substance with knowledge of its presence and illegal character." (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1746.) "Unlawful possession of a controlled substance for sale requires proof the defendant possessed the contraband with the intent of selling it and with knowledge of both its presence and illegal character." (*Id.* at pp. 1745-1746.) To prove that an accused is guilty of unlawfully carrying a loaded firearm in violation of section 25850, subdivision (a), the prosecution must establish—among other things—that the accused knew about the gun's presence. (See *People v. Rubalcava* (2000) 23 Cal.4th 322, 331-332.) Likewise, to prove that an accused is guilty of unlawful possession of a firearm in violation of either section 29800 or section 29830, the prosecution must establish—among other things—that the accused knew about the gun's presence. (See *People v. Snyder* (1982) 32 Cal.3d 590, 592.) "Evidence of a defendant's state of mind is almost inevitably circumstantial, but

33.

circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208; see *People v. Pre* (2004) 117 Cal.App.4th 413, 420 ["Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense."].)

" ' "Conspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy." ' [Citation.] ' "Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " ' [Citations.]" (*People v. Dalton* (2019) 7 Cal.5th 166, 244.) " ' "One who conspires with others to commit a felony is guilty as a principal. [Citation.] ' "Each member of the conspiracy is liable for the acts of any of the others in carrying out the common purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design." [Citations.]' [Citation.]" [Citation.]' " (*Ibid.*) " '[A]n uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation] . . . ." [Citation.]' [Citations.]" (*People v. Valdez* (2012) 55 Cal.4th 82, 150.)

The record—viewed in the light most favorable to the prosecution—demonstrates that Avendano, Lizeth, and Miguel (1) knew about the presence of the methamphetamine and firearm; and (2) conspired to commit the substantive offenses with at least one other codefendant.

In the wee hours of January 25, 2017, Avendano was driving his girlfriend Lizeth's Honda Accord on Columbus Street when he passed Eddy's patrol vehicle, "crane[d] [his] neck," and gave Eddy a "long look." After Eddy turned around and

trailed the Accord, there was "some movement going on within the vehicle" and Avendano "look[ed] at [Eddy] in the rearview mirror." Following a moving violation at the intersection of Alta Vista Drive and Columbus Street, Eddy effected a traffic stop. After the Accord was pulled over, (1) Avendano "look[ed] at [Eddy] in the side mirror" and then "turn[ed] around and . . . ha[d] a conversation with somebody," either Lizeth (the front seat passenger) or her brother Miguel (the rear passenger); and (2) all three "mov[ed] around." (Cf. *People v. Meza*, *supra*, 38 Cal.App.4th at p. 1746 [the defendants "looked around in all directions" before they entered a residence and left in a vehicle carrying over 70 pounds of cocaine].)

Subsequently, defendants were removed from the Accord and Poteete conducted a search of the vehicle. "[O]n the floorboard in between the back passenger's seat and the backseat of the front passenger," she found the backpack containing plastic bags filled with methamphetamine (the total quantity of which far exceeded the amount normally associated with personal use), a loaded firearm, a digital scale with methamphetamine residue, money (including smaller bills), black gloves, a cell phone, and a gold watch. Though "[t]here was no evidence [that Avendano, Lizeth, or Miguel] physically possessed the [contraband] in question" (*People v. Johnson* (1984) 158 Cal.App.3d 850, 854), " 'possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, or to the joint dominion and control of the accused and another' " (*ibid.*). Avendano, Lizeth, and Miguel had all been within reach of the backpack. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 624 [officers found a loaded firearm in the defendant's bedroom "about a foot away" from where he had been using his computer]; *People v. Hunt* (1963) 221 Cal.App.2d 224, 225, 227 [police pulled over the defendant's vehicle and found a revolver on the floorboard in front of his passenger].) In addition, Lizeth was the owner of the Accord and ostensibly gave Avendano permission to drive it. (See *People v. Jenkins* (1979) 91 Cal.App.3d 579, 584 ["The inference of dominion and

control is easily made when the contraband is discovered in a place over which the defendant has general dominion and control: his residence [citation], his automobile [citation], or his personal effects [citation]."].) Poteete searched Lizeth's person and seized five $1 bills; Barrier searched Miguel's person and seized a $10 bill and an empty "clear plastic Baggie." A few days later, during a jail call between Avendano and Lizeth, Lizeth alluded to her awareness of the contraband when she remarked, "[L]ike you guys should have did what I told you guys to do. [¶] . . . [¶] . . . When we got pulled over. [¶] . . . [¶] . . . When the cop got off you should've smashed off, 'cause it was only one cop."

At trial, the parties stipulated that the Loma Bakers are a criminal street gang pursuant to section 186.22. Jones testified that members of this Sureño-affiliated gang (1) primarily engage in drug sales and illegal firearm possessions, among other crimes; (2) sell drugs to raise money to "buy[] more drugs," "buy[] weapons," and "bail[] out fellow gang members"; (3) often possess firearms while conducting drug sales to defend themselves against rivals and law enforcement; (4) commit crimes in numbers for "safety" and "camaraderie"; and (5) are subject to the traditional Sureño rule that armed members must inform fellow members of the gun. Jones opined that Avendano, Lizeth, and Miguel were members of the Loma Bakers at the time of the January 25, 2017 incident, given that (1) at the time of the traffic stop, defendants' vehicle carried a large quantity of methamphetamine and a loaded firearm and was "on the edge of disputed gang territory"; (2) at the time of the traffic stop, Miguel was wearing gang-related apparel; (3) Avendano and Miguel bear gang-related tattoos; (4) during the jail call, Avendano expressed a gang-related phrase ("[o]n the hood") and Lizeth revealed that she had consulted Jokes, a known Loma Baker; (5) in the past, Avendano admitted to police officers that he is a Loma Baker; (6) in the past, Avendano and Miguel were each seen in the company of other gang members; and (7) there was gang-related graffiti on the walls

of Lizeth's garage.[17]  (See *People v. Superior Court (Quinteros)* (1993) 13 Cal.App.4th 12, 20 ["[C]ommon gang membership may be part of circumstantial evidence supporting the inference of a conspiracy."]; see also *People v. Vang* (2011) 52 Cal.4th 1038, 1044 ["[T]he subject matter of the culture and habits of criminal street gangs" " 'is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' "].)

Based on defendants' conduct before and after the traffic stop; the items recovered from the searches; defendants' intimate relationships with one another; and their gang memberships, interests, and activities, a rational trier of fact could find beyond a reasonable doubt that defendants (1) knew about the presence of the methamphetamine and firearm in the Accord; and (2) positively or tacitly came to a mutual understanding to transport and sell the drugs as well as possess the firearm.[18]

## IV. Substantial evidence supported the gang enhancement findings based upon the law as it stood at the time of the trial.

### a. *Background*

In addition to convicting Avendano, Lizeth, and Miguel of unlawful transportation of a controlled substance and unlawful possession of a controlled substance for sale, the jury found true the allegations that defendants committed these crimes for the benefit of or in association with the Loma Bakers.

---

[17] We also point out that, by virtue of Lizeth's relationships with Avendano (her boyfriend) and Miguel (her brother), a rational trier of fact could reasonably infer that she was aware of their gang memberships.  (See *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322 (*Villalobos*).)

[18] Given our disposition on this matter, we necessarily reject Avendano's ancillary claim that "the gang enhancements attached to . . . counts [1 and 5] should automatically be reversed," which is premised on a finding that "there was insufficient evidence to prove counts 1 and 5."

b. *Standard of review*

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

c. *Analysis*

Both before and after its recent amendment (see Stats. 2021, ch. 699, § 3), section 186.22, subdivision (b)(1) provides, in essence:

> "[A] person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which [the person] has been convicted, be punished . . . ." (Accord, *People v. Albillar*, *supra*, 51 Cal.4th at p. 59.)

"There are two prongs to the gang enhancement under section 186.22, subdivision (b)(1). [Citation.] The first prong requires that the prosecution prove the underlying felony was 'gang related.' [Citations.] The second prong 'requires that a defendant commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members." ' [Citations.]" (*People v. Weddington* (2016) 246 Cal.App.4th 468, 484, fn. omitted (*Weddington*).) "In order to prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert

testimony on criminal street gangs." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048 (*Hernandez*).)

"Section 186.22, subdivision (b)(1) provides three alternatives for establishing the first prong—that the underlying offense was 'gang related.' The offense may be committed (1) for the benefit of a gang; (2) at the direction of a gang; *or* (3) in association with a gang. [Citation.] Because the first prong is worded in the disjunctive, a gang enhancement may be imposed without evidence of any benefit to the gang so long as the crime was committed in association with or at the direction of another gang member. [Citations.]" (*Weddington*, *supra*, 246 Cal.App.4th at p. 484.) "As to the second prong of the enhancement, all that is required is a specific intent 'to promote, further, or assist in any criminal conduct by gang members.' [Citation.]" (*Villalobos*, *supra*, 145 Cal.App.4th at p. 322; see *People v. Pre*, *supra*, 117 Cal.App.4th at p. 420 ["Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense."].)

Both Lizeth and Miguel argue that "there [i]s no substantial evidence to prove either prong." We disagree. The parties stipulated that the Loma Bakers are a criminal street gang pursuant to section 186.22. Based on the totality of the circumstances, Jones opined that each defendant was a member of the Loma Bakers at the time of the January 25, 2017 incident. Avendano bears tattoos of various letters and symbols associated with the gang and previously admitted to police officers that he is a Loma Baker who "put[s] in work." (See *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331 [evidence of gang tattoos and admission of gang membership].) Miguel similarly bears gang-related tattoos of the word "Lomero" and the number "13" and was seen in the company of Soliz—a known member of the Gage Street subset of the Loma Bakers— in 2015. (See *In re Jose P.* (2003) 106 Cal.App.4th 458, 468 [minor had been contacted on several occasions in the company of known gang members], disapproved in part by *People v. Prunty* (2015) 62 Cal.4th 59, 78, fn. 5.) On the morning of January 25, 2017,

defendants' vehicle was pulled over in disputed gang territory and a search thereof uncovered a large quantity of methamphetamine, a loaded firearm, a digital scale with methamphetamine residue, money, black gloves, a cell phone, and a gold watch. According to Jones, Loma Bakers primarily engage in drug sales and illegal firearm possessions, have guns for protection during such sales, and commit crimes collectively for "safety" and "camaraderie." (See *Weddington*, *supra*, 246 Cal.App.4th at p. 485 [gang's "signature crime"].) At the time of the traffic stop, Miguel was wearing gang apparel. (See *Jose P.*, *supra*, at p. 468 [minor observed wearing gang-related attire].) During the jail call on or around January 29, 2017, Lizeth divulged that she had communicated with Jokes, a known Loma Baker. (See *ibid*.) There was also gang-related graffiti sprayed on her garage wall. "Committing a crime in concert with known gang members can be substantial evidence that the crime was committed in 'association' with a gang." (*People v. Garcia* (2016) 244 Cal.App.4th 1349, 1367; see *Weddington*, *supra*, 246 Cal.App.4th at p. 484.) "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime." (*Villalobos*, *supra*, 145 Cal.App.4th at p. 322.)

Jones also testified about the benefits that the Loma Bakers obtain from selling methamphetamine and possessing firearms. As to the former, the gang acquires funds to purchase more drugs and weapons and to bail out members. As to the latter, the gun provides protection against rivals and law enforcement and can instill fear in the community at large, which would allow the gang to "get away with" more crimes. Jones added that (1) members who "put[] in work for the gang," e.g., "burglarizing someone, stealing their car, shooting, stabbing, robbing," "bolster [their] reputation[s] within the gang" as trustworthy individuals and enhances the gang's reputation "through . . . word-of-mouth" and portrayal in the media; and (2) money-making ventures "in turn build[] . . . power . . . [and] respect" for the gang. (See *People v. Vang*, *supra*, 52 Cal.4th at

40.

p. 1048 [" 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement."].)

Therefore, we conclude a rational trier of fact could find the gang enhancement allegations true beyond a reasonable doubt.

## V. The prosecution's failure to comply with the reciprocal discovery law did not amount to prejudicial error.

a. *Background*

Citing section 1054, Miguel moved in limine for a ruling "[r]equir[ing] the prosecution to provide immediately all notes and/or statements whether in written format or not, taken by the prosecution, their representatives and/or law enforcement that have not been previously produced." The trial court denied the motion without prejudice.

On March 19 and 21, 2019, Jones testified at an Evidence Code section 402 hearing. On the question of Miguel's affiliation with the Loma Bakers, Jones considered Miguel's tattoo and the Houston Astros baseball cap that was worn at the time of the traffic stop; Martinez's general offense report detailing his June 9, 2016 encounter with Miguel; and Barajas's "street check" detailing his August 19, 2015 encounter with Miguel.

On March 27, 2019, Jones was cross-examined by Miguel's attorney. The following colloquy transpired:

"Q. And not one law enforcement officer that you have spoken to has advised you that Miguel Aldaco is, in fact, a gang member?

"A. No, I can't say that anybody has specifically told me that Miguel Aldaco was a gang member.

"Q. You have contact with known gang members on a daily basis as you testified to; is that right?

"A. Yes.

41.

"Q. And those members belong to the Loma Bakers?

"A. Yes, some do.

"Q. And, again, none of those contacts have led you to information that people have stated Miguel Aldaco is, in fact, a gang member?

"A. That's not exactly true.

"Q. So you have talked to people who told you that Miguel Aldaco was a gang member?

"A. They have shown me that they are a gang member, yes. The person I have talked to has led me to that."

Upon Miguel's attorney's request, the court called the attorneys to sidebar. Thereafter, outside the presence of the jury, Miguel's attorney voir dired Jones. The following colloquy transpired:

"Q. Officer Jones, now, . . . as to the statements that you received regarding Miguel Aldaco's gang affiliation, could you give me information regarding that.

"A. Sure. A very well-known, well-documented Loma Baker gang member, who I contacted regularly at times, named Louis Massey, Jr., posts on his social media, four different pictures with Mr. Miguel Aldaco identifying him as, quote, my nigga' risk loco.

"Q. When did you obtain this information?

"A. Four or five days ago.

"Q. Did you advise anybody regarding this information?

"A. I did.

"Q. Who did you advise?

"A. The [prosecutor].

"Q. You told him, specifically, that this was information that you had and did you give him the photographs?

"A. I e-mailed a screen shot of them, yes.

"Q.    Do you have that e-mail?

"[PROSECUTOR]:  Your Honor, I'll stipulate that I got a screen shot from Officer Jones of something I didn't go into.  I did not interpret the e-mail in the way that I think it is clear now it was sent.  But yeah, that was sent earlier.

"THE COURT:      Do you have it?

"[PROSECUTOR]:  I think so.

"THE COURT:      We will take a short break here while [the prosecutor] shows defense counsel.  And then before we bring the jury back in, we will resume this voir dire.  [¶]  Ten-minute recess or longer.

"(A recess was taken.)

"THE COURT:      Counsel are present, all defendants are present.  [¶]  Where are we counsel?  [¶]  We were in the middle of voir diring Officer Jones.  [¶]  Do we need Officer Jones to return to the stand or – it looked like you guys were talking about something; so where are we?

"[MIGUEL'S ATTORNEY]:      Your Honor, it's my understanding that the district attorney is not going to be bring[ing] that evidence in.  [¶]  The issue I have, though, is this information was sat on four days previous to Officer Jones even testifying.  Not giving it to me, placing me in a situation where I have asked a question.  [¶]  I have reviewed all the gang discovery in this case.  I have provided everything I have.  And then to know there is a possibility I'm going to ask you certain questions, because I have reviewed everything that's been provided to me. [¶]  When I don't have everything that an actual officer is relying on in his opinion, I'm asking a question that is eliciting, in this officer's opinion, that [*sic*] things I don't even have.

"Now, the jury has in their mind, is thinking oh, some gang member told this officer that [Miguel] is a gang member.  If I had had the information my, cross-examination would have been a little bit different.  But because I didn't, my cross-examination led to an area that now opened this door, that in the minds of the jury, a gang member is telling Officer Jones that my client is a gang member.  That's one of the issues that I am having here.  [¶] . . . [¶]

"At this point I am moving for a mistrial based on what just occurred, because at this point, I don't believe the jury is going to get out of their mind that Officer Jones did not speak to someone.  Or at least they are

43.

going to be alluding that he spoke to someone that made, in fact, this statement that [Miguel] was a gang member. [¶] . . . [¶]

"[PROSECUTOR]: So in all of the items that Officer Jones is trying to track down trying to get for defense, one of the things he did is sen[d] to me a text message, a screen shot from social media. This was during a time when I was driving. . . . I was driving to Las Vegas. . . . I had to drive 12 hours over the weekend. [¶] Yes, I think one or two text messages slipped through the cracks. I have been sending everything else I have. It is not exculpatory. It's inculpatory. I didn't use it because I forgot it even existed. [¶] I think the question asked, has any gang member told you that [Miguel] is a gang member.

"THE COURT:    It's a little broader, as I understand the question. I think we are going to have Madam Reporter go back to read it in just a second here. But I believe the question was more like, so have you talked to people who told you that Miguel Aldaco was a gang member, or words to that effect.

"[PROSECUTOR]: And I think that this answer is, frankly, nonresponsive.

"THE COURT:    It is nonresponsive. And I'm going there.

"[PROSECUTOR]: I think that an objection, move to strike, should be granted. [¶] . . . [¶] So I think if the objection is sustained as nonresponsive and it's stricken, the jury is admonished don't consider this, then [Miguel's attorney] can continue her examination. [¶] . . . [¶] I appreciate [Miguel's attorney] is correct. If I have information, Officer Jones has information, we are hiding it, and then she may fall into a trap where she is asking the question, got you, shouldn't be in the nature of a cross-examination. Legally, it shouldn't. And I understand that.

"THE COURT:    Let me ask defense counsel this. [¶] Are we finished voir diring the witness on this particular topic? [¶] Do we know enough?

"[MIGUEL'S ATTORNEY]:    I know enough, your Honor.

"THE COURT:    Have you had a chance to talk to Officer Jones off the record before we had this conversation?

"[MIGUEL'S ATTORNEY]:    Yes. [¶] . . . [¶]

44.

"THE COURT: . . . . I'm going to give you a platform to talk. But I want the reporter to read back the last question and answer so . . . we have it specifically in mind. [¶] . . . [¶]

"(Record read . . . . [¶] . . . [¶]

"THE COURT: [Defense counsel for Miguel], you have the floor.

"[MIGUEL'S ATTORNEY]: Your Honor, I believe when the court hears that answer, there is no disregarding that from the jury, at all. This is something that is very critical in the case at hand, whether or not [Miguel] is an actual gang member. That's something that is in dispute in this case, significant dispute. And that response, alone, makes a jury believe that there is something out there. The judge tells them to disregard that, in my mind they are thinking that I am doing something to not disclose that information to them. That is very critical.

"I think my credibility to the jury is completely demolished after that answer. And I don't believe that, at this point, [Miguel] is going to receive a fair trial regarding that specific issue in this case. A limiting instruction, alone, or just an instruction, alone, is not something that's going to save [Miguel]'s ability to have a fair trial in this case.

"My credibility is on the line. And his rights to a fair trial, simply because something was not given to me that needed to be given to me. It's regardless of who believes something is important or not important. That doesn't matter. If the officer is relying on something for his opinion, we have the right to have it, because it will determine our cross-examination. It will determine our theory on the case. And that is something that is of great importance. [¶] . . . [¶] Now the jury has some information that there is something floating out there that specifically ties my client to the Loma Bakers because of what was stated. [¶] . . . [¶]

"THE COURT: Here is my concern. [Miguel's attorney] has been put in a very awkward position. Having reviewed all of the information that she had, she asks a question that she thinks she knows the answer to, 'Have you talked to any people who have said this?' And – well, actually in the form of a leading question, basically, 'You haven't talked to anybody who has said that?' And [Jones] says, 'That's not exactly true.' Bing. A red light going off, because up until now, we haven't heard about any of that.

45.

"And then, unfortunately, she goes one step further and says, 'So you have talked to people who have told you that [Miguel] was a gang member?' And this is the nonresponsive part of it. He didn't say, 'No, I haven't talked to anybody.' He said, 'They have shown me,' and gets into that. So that's when the sidebar is requested.

"[PROSECUTOR]: Yes, I agree that that does put counsel in an awkward position. I think part of that is obviously my fault. I concede. I dropped the ball. Something was said to me. And because I was busy and otherwise engaged, I did not send it to the defense.

"However, there is a huge divide between being caught off guard in one question that was unclear enough that I didn't even catch exactly what was being asked at first. And the answer was not directly responsive to that question. [¶] The idea that [Miguel's attorney's] credibility is shot, it is no way shot. She asked a question. She has asked a number of questions which have been answered in this type, 'It is difficult to answer your question' sort of question. If we strike that answer from the record, we strike the question and answer, the last two, [Miguel's attorney] will not be in an awkward position. [¶] . . . [¶]

". . . [O]n late Friday, . . . which is already a week into the case, the officer finds two screen shots that are then, by my fault, inadvertently not disclosed. Two questions, depending on how you look at it, are asked of the expert, and get an answer that suggests there may be more. [¶] We strike the questions, strike the answers as nonresponsive, the jury is not going to take that one or two questions out of the entirety of the proceedings, and say, 'That's it. I'm done. I have made my decision.' It's been blown out of proportion to that effect.

"I do think that there is something else to consider, and that is I'm not going to be using this information. I had no intent to use it. I think it's useful information. It's exculpatory. But I didn't use it. I'm not seeking to use it. Counsel is aware of it.

"Her examination will be done with fully eyes open. And she is aware of it, and she can still actually ask the question, 'Is there a gang member out there who has specifically told you that [Miguel] is a gang member?' And based on what the officer's told us today, the answer to that question will be 'No.' [¶] So what the jury is going to hear is the questions were vague and ambiguous. We are going to strike them, strike the answer. She asks the question and then the answer which, based on what Officer Jones has told us, nobody has told me, no gangster has told me that guy is a gang member.

"THE COURT:	[Miguel's attorney], assume for the sake of argument I deny your motion for mistrial, how would you propose the best way of rectifying the situation?  [¶] . . . [¶]

"[MIGUEL'S ATTORNEY]:	Your Honor, the only thing that we can have is a jury instruction to the jury.  That's the only other –

"THE COURT:	I'm talking about in terms of your concerns that there is this thing out there.  [¶]  How would you want to handle that in the testimony?  [¶]  How would you want to handle that?  [¶]  [The prosecutor] has proposed that it get stricken.

"[MIGUEL'S ATTORNEY]:	Well, of course, I think at least it has to get stricken.

"THE COURT:	Anything else?

"[MIGUEL'S ATTORNEY]:	I think Officer Jones needs to be admonished he needs to listen to the question, and he needs to answer it directly.

"THE COURT:	That's going to happen.  [¶]  What else?

"[MIGUEL'S ATTORNEY]:	I can't think of anything else right now.

"THE COURT:	[Avendano's attorney], do you have any horse in this race?

"[AVENDANO'S ATTORNEY]:	I would suggest some type of stipulation can be reached to clear it up so that that does not linger in the background, because they heard it –

"THE COURT:	And I need – if I am going to do that, I am going to do that today.

"[PROSECUTOR]:  I think an admonishment to the jury that there were a couple of questions, couple of answers given right before our break, it's been stricken, do not consider it.

"[MIGUEL'S ATTORNEY]:	I think, honestly, too, I don't want the jury to think there is direct evidence out there that my client is, in fact, a

47.

Loma Baker criminal street gang member.  I think we need a stipulation to that.[19]

"THE COURT:    If you ask the officer, 'Officer, I'm going to reask my question,' or words to that effect, and you said, 'Now, listen to my question:  Have you talked to anybody who has told you?'  And he says, 'No, I haven't.'  And that's how we end the day.  [¶]  Is that what you want?

"[MIGUEL'S ATTORNEY]:    If that's my only option, then, yes. I can't think of anything else, your Honor.

"THE COURT:    Well, I'm going to give you overnight to think about it some more.

"I'm going to deny your motion for mistrial because I think that this can be remedied.  And I will give you an opportunity overnight to think of what else you may require.

"It's the end of the day today.  I want to clean this up now before they go home tonight.  We are going to deal with this question and bring the jury in and deal with it, and let them go after you have a few questions. That's how we are going to handle it.

"[MIGUEL'S ATTORNEY]:    Thank you.  [¶]  Before the jury does come in, if there is any other lingering information that Officer Jones is relying upon, I would like it immediately.

"THE COURT:    I am going to order that the People – there is a previous motion that I denied without prejudice.  I'm going to grant that motion.  And I'm ordering the People to turn over to the defense any additional information – it doesn't have to be in the next five minutes – but any additional information that any witness has obtained from the last report up until now so that there can be no possibility that we run across this sort of thing again.

"[PROSECUTOR]:  Yes, your Honor."

After the jury returned to the courtroom, the following colloquy transpired:

"THE COURT:    Welcome back to the courtroom, ladies and gentlemen.  [¶]  Members of the jury, there was – before we went to side

---

[19] The record does not indicate that such a stipulation was ever obtained.

bar and then, ultimately, went to break, there were a couple of questions and answers. And I've stricken those answers. Those answers were nonresponsive.

"Officer, I'm going to direct you at this time, you need to listen carefully to the question that is being asked and only answer the question that is being asked.

"THE WITNESS: Yes, sir.

"THE COURT: Pay attention exactly to how it's being phrased."

Miguel's attorney then resumed cross-examination:

"Q. Now, Officer Jones, as to my last question, you have not contacted any gang members who have told you Miguel Aldaco is a gang member?

"A. No.

"Q. Now, so the only information, then, that you are relying upon in this case to establish – well, some of the information you are relying upon in this case to establish your opinion is a tattoo on [Miguel]; is that correct?

"A. Yes.

"Q. And contacts that he's had with law enforcement?

"A. And the apparel at the time of the offense.

"Q. Is there anything else you are considering?

"A. No, not at this time."

On March 28, 2019, outside the jury's presence, the court and counsel discussed Jones's "bury" remark. (See *ante*, at p. 21.) During the exchange, the court commented:

"I was in the courtroom for some period of time when counsel were collecting their things getting ready to leave; so this was all happening fairly quickly on the heels of my fairly forceful statement to Officer Jones dealing with the circumstance of his unwittingly bringing into, in front of the jury, information that should not have come in front of the jury. Not his fault, though. And so I felt that I should make a forceful statement in front

49.

of the jury so that it was understood that [Miguel's attorney] did nothing wrong. And I was trying to solve a problem.

"In retrospect, I'm not sure that was the best way to handle that. And I fault myself because that, essentially, you know, as I think back on it, when I think of the two questions and answers, I should say the two answers that were stricken, one of those answers was not nonresponsive, the first one. The second one was. And my ruling in front of the jury was two answers nonresponsive. Okay."

Prior to closing arguments, the court instructed the jury, in part:

"During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses. I ruled on the objections according to the law. If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did. If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose." (Accord, CALCRIM No. 222.)

b. *Analysis*

Section 1054.1 " '. . . requires the prosecution to disclose to the defense . . . certain categories of evidence "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies." ' [Citation.] Evidence subject to disclosure includes '[s]tatements of all defendants' [citation], '[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged' [citation], any '[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts' [citation], and '[a]ny exculpatory evidence' [citation]. 'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial. [Citation.]' [Citation.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 279-280.) "Upon a showing both that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court 'may make any order necessary to enforce the provisions' of the statute, 'including, but

not limited to, immediate disclosure, . . . continuance of the matter, or any other lawful order.' [Citation.]" (*Id.* at p. 280.)

A violation of section 1054.1 is subject to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Verdugo*, *supra*, 50 Cal.4th at p. 280.) Under this standard, an error is reversible "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, at p. 836.)

On appeal, Miguel contends:

> "Here, the prosecution was mandated to forward to the defense all evidence that created the bases for Jones's testimony. [¶] . . . [¶] However, . . . Jones stated that he found Miguel's photograph – which created one of the bases for his expert opinion, not on Miguel's Facebook page, but on another gang member's, Louis Massey, Jr.'s, Facebook page. [Citation.] Furthermore, it was not Miguel who tagged the photo, 'my nigga' risk loco', but the administrator, Louis Massey, Jr., of the Facebook page who had so implicated Miguel as his 'nigga' ' or friend. Miguel may have had no knowledge that this Facebook post – where Massey claimed Miguel was his friend – existed. Miguel may not even know these photographs existed. The prosecution clearly failed to discover relevant and potent evidence that it should have forwarded to the defense five days prior when it first received this evidence. This was a clear, even if inadvertent, discovery violation.

> "Moreover, because of the impact this violation had on the defense's case, the court erred when it did not grant a mistrial. There was an intolerable risk that the curative instruction to the jury to ignore Jones's answers to [Miguel's attorney's] questions would be ineffective."

Even if the prosecution timely disclosed information about the social media posts, which would have forestalled the line of questioning that elicited Jones's problematic answers, we find no reasonable probability that a result more favorable to Miguel would have been reached. Before he was cross-examined by Miguel's attorney, Jones testified at both the Evidence Code section 402 hearing and on direct examination that his opinion

51.

on Miguel's gang membership was based on (1) Miguel's "Lomero" tattoo; (2) Miguel's Houston Astros baseball cap; and (3) Miguel's companionship with other gang members (Soliz and Avendano) in 2015 and 2016, respectively. On direct examination, Jones also considered the fact that Miguel had been with Avendano "on a dangerous mission . . . selling drugs . . . on the edge of disputed gang territory" on January 25, 2017. Absent the discovery error, it is still likely that the jury would have determined that Miguel was a Loma Baker at the time of the January 25, 2017 incident.

In addition, the court exercised its "broad discretion to fashion a remedy in the event of a discovery abuse to ensure that [Miguel] receive[d] a fair trial." (*People v. Bowles* (2011) 198 Cal.App.4th 318, 325.) Following the voir dire examination, it notified the jury that it had stricken Jones's "nonresponsive" answers and admonished Jones in a "fairly forceful" manner. Prior to closing arguments, the court instructed the jurors that they "must disregard" any "testimony stricken from the record" and "must not consider that testimony for any purpose." (See *People v. Horton* (1995) 11 Cal.4th 1068, 1121 ["We must presume the jury heeded the instruction and disregarded the stricken material, as it was required to disregard such material when originally presented during the course of the testimony."]; *People v. Allen* (1978) 77 Cal.App.3d 924, 934 ["A jury is presumed to have followed an admonition to disregard improper evidence particularly where there is an absence of bad faith."].)

## VI. Assuming arguendo that Jones improperly expressed an opinion on Miguel's guilt, the alleged error was not prejudicial.

### a. *Background*

On direct examination, the prosecutor asked Jones a series of hypothetical questions. The following colloquy transpired:

> "Q.     Okay. So I'd like you to assume that near 1 o'clock in the morning, officers stopped a vehicle that is on the boundary of Loma Baker territory in Bakersfield, a boundary that they share with the Uptown Bakers.

"I would like you to assume that the driver of that vehicle has prominent facial tattoos indicating membership with the Loma Bakers criminal street gang.

"I'd also like you to assume that the front seat passenger is a member, but has no displayed tattoos associated with the Loma Bakers criminal street gang. The front seat passenger is also romantically involved with the driver who, not only prominently displays tattoos, but has a number of other Loma Baker tattoos on his body.

"In addition to these two, there is a rear seat passenger. The rear seat passenger has a prominently displayed Loma Baker tattoo on his chest and is wearing a hat that prominently displays an H consistent with the Hillside clique of the Loma Bakers.

"I'd also like you to assume for the purpose of this hypothetical, right next to the rear seat passenger in a backpack on the floorboard there is located approximately 15 grams of methamphetamine, a gold watch, small bills in currency, as well as change, a cell phone and a tablet, a pair of gloves; that none of the individuals searched personally possessed a tablet or a phone.

"One of the individuals possessed a plastic bag material with a $10 bill in their pocket. That would be the backseat passenger.

"Based on the facts that I've given to you, do you have those in mind?

"A.    Yes.

"Q.    And presupposing it's your opinion that the drugs possessed were possessed for sale, do you have an opinion as to this hypothetical whether those drugs, being possessed for sale, were possessed for sale for the benefit of, in association with, or at the direction of the Loma Bakers criminal street gang?  [¶] . . . [¶]

"[JONES]:    Yes.  I do have an opinion.  [¶] . . . [¶]

"Q.    What is that opinion?

"A.    My opinion is that they were possessed for purposes of sales, as well as the firearm being possessed for the benefit of and in association with.

53.

"[LIZETH'S ATTORNEY]:      That was not part of that hypothetical.

"THE COURT:      Sustained.  [¶] . . . [¶]

"Q.      Specifically, just the drugs being possessed for sale, do you have an opinion as to those?

"A.      Yes.

"Q.      And what is that opinion?

"A.      That it is for the benefit of and in association with the Loma Bakers.

"Q.      Can you describe how you got to your opinion in the hypothetical situation.

"A.      As I've stated at length, drug sales is a primary activity of the Loma Bakers.  You have certainly two, and I would argue three, members of the gang who are actively participating in this crime of selling drugs.

"Not only that, they are on the boarder [*sic*] of this disputed territory with, again, a very violent up-and-coming young gang, the Uptown Bakers.  Because of that, a firearm is needed for protection in order to facilitate.

"[LIZETH'S ATTORNEY]:      Objection.  Hypothetical.

"THE COURT:      Sustained.  [¶] . . . [¶]

"Q.      As part of your opinion, I would like you to also take into account the hypothetical factors a loaded 0.9 millimeter firearm is in the same backpack with the methamphetamine.

"A.      Okay.  I will do.

"Q.      Does that change your opinion?

"A.      It does not change my opinion.

"Q.      Can you describe or can you describe for the jury the bases for your opinion?

"A.      As I stated before, three Loma Bakers gang members on the disputed edge of gang territory.

"[LIZETH'S ATTORNEY]:     Objection.  That was not part of the hypothetical.

"THE COURT:     Sustained.  [¶] . . . [¶]

"Q.     For the purpose of the hypothetical, I would like you to only assume that the driver and the rear seat passenger were Loma Baker gang members.

"A.     Okay.  You have two Loma Baker gang members and an associate of the Loma Bakers riding in a car together, on the edge of disputed territory, next to a very violent gang, the Uptown Bakers.

"[LIZETH'S ATTORNEY]:     Objection.  The associate was not part of the hypothetical.

"THE COURT:     Sustained.  [¶] . . . [¶]

"Q.     When you say 'associate,' can you described what you mean by that.

"A.     If we are talking about [Lizeth], I personally believe she is a member.

"[LIZETH'S ATTORNEY]:     Nonresponsive.

"THE COURT:     Sustained.  [¶] . . . [¶]

"Q.     Then what I would like to do is amend my hypothetical and ask that you try to keep your opinion essentially just to the hypothetical facts I've given you.

"Assume that the front seat passenger, who is the girlfriend of the driver, is not a member but is merely the girlfriend of the driver and the sister of the backseat passenger.  And assume for the purpose of the hypothetical the driver and the backseat passenger are members.

"Has your opinion changed based on these facts?

"A.     No, it hasn't.

"Q.     Can you, please, explain the basis for your opinion?

"A.     You have two Loma Baker gang members in a vehicle riding together with another person who is a family member and an intimate dating relationship partner.  They are riding together at 1 o'clock in the

55.

morning, a generally dangerous time of night, on the edge of disputed gang territory next to Uptown Bakers, a violent upstart gang, while in possession of a large amount of methamphetamine that is being sold, an inherently dangerous activity.

"The firearm is also located with the methamphetamine which is used to facilitate those transactions. You need that to defend yourself or even if you want to, you could attack a rival who is in your territory and scare them off.

"As I mentioned before, the drugs themselves, the selling of drugs, benefits the gang by generating income for [it]. The firearm is used for protection of the gang in the course of this criminal enterprise.

"In addition, the firearm, itself, is a reputation builder. It boosts your reputation both within the gang and without. If someone from the Uptown, let's say, sees you rolling around in this car and wants to try something, all you have to do is pull out that gun, and they will think twice about it.

"At that point they are going to go and tell everyone else better not mess with the Loma. They are strapped right now.

"All of these things were done in benefit of the gang, and in association with the gang because you have two well-documented Loma Baker gang members participating in this, you know, overtly gang activity – selling drugs, carrying guns, in gang territory, past midnight.

"Q. Now, I'd like you to assume that the front seat passenger is not just the girlfriend of the driver but is, in fact, a member of the Loma Bakers, herself.

"Does that change your opinion or strengthen it or weaken it?

"A. It doesn't change it. I would say it strengthens it.

"Q. How so?

"A. Now you have three people who are Loma Baker gang members. And as I mentioned before, there is safety in numbers, as well as this building of reputation, building of respect. You have now two people who can vet and attest to what you did within the gang. They can go and tell all the older homies what you did. And that's going to boost you up. Likewise, they could do the same for you if you were that third member or the second member.

"Again, if all the facts remain the same, at this point you are adding a third person who is, in my opinion, 100 percent involved and nothing of the gang activity that's taking place.

"[LIZETH'S ATTORNEY]:      Calls for speculation.

"THE COURT:    Sustained.

"[PROSECUTOR]:  As to the last statement?

"THE COURT:     Correct, as to the last statement.
[¶] . . . [¶]

"Q.    Officer Jones, what if we change the hypothetical again. The driver is a member of the Loma Bakers. The front seat passenger is the girlfriend and note [*sic*] a Loma Baker. The backseat passenger is a person that shows some signs of association with the Loma Bakers, but is not a member of the Loma Bakers.

"Would your opinion change then? [¶] . . . [¶]

"[JONES]:   No, my opinion still wouldn't change.
[¶] . . . [¶]

"Q.    Can you explain to the jury, if we are changing these facts, why wouldn't your opinion change?

"A.    So the benefit portion would be unaffected. You still have a gang member who is participating in this inherently gangster-like activity – selling drugs, carrying a gun, on the edge of gang territory, dangerous time of night, dangerous location.

"The proceeds of the drugs can still be used for the gang despite the fact you only have one fully vetted member. The fact that you only have one will not change that. In fact, if you add the second person who is merely an associate doesn't change that, either.

"Part of the reason it doesn't change . . . is because that associate, in my opinion, that now becomes their initiation, almost. You have hung around us long enough –

"[MIGUEL'S ATTORNEY]:     Objection. Speculation.

"THE COURT:    Sustained. [¶] . . . [¶]

"Q.     How would the presence of [a] mere gang associate as opposed to a fully fledged gang member be relevant when we are talking about possession or transportation for sale of methamphetamine at night in gang territory in a car being driven by a gang member?

"A.     You still have a gang member who is almost literally taking the wheel on this activity.  They are driving these people around and are specifically an associate, somebody who may not be considered a full member, but has expressed interest and has done certain things to be considered on the outskirts of this gang, so to speak.  You now have . . . somebody who's a fully vetted member telling somebody who wants to be a fully vetted member –

"[MIGUEL'S ATTORNEY]:     Objection.  Speculation.

"THE COURT:     Sustained.  [¶] . . . [¶]

"Q.     I'll just get passed this.

"Is your opinion the same based on the new facts that I have given you?

"A.     No.  I'm sorry.  My opinion has not changed.  No.

"Q.     What if none of the individuals in the car were gang members, none of them displayed any gang tattoos?

"A.     That would 100 percent change my opinion.

"Q.     How so?

"A.     You don't have a gang crime anymore.  You may have a crime that could be qualified as part of the Penal Code definition of gang activity.  [¶] . . . [¶]  . . . However, you have nobody who meets the definition of a gang member, nobody that is actively participating, nobody that is doing anything or at least showing any signs of benefiting this gang or in association with this gang or at the direction of this [gang]."

b.  *Analysis*

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is . . .  [¶] . . . [r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] . . . [b]ased on matter (including his special knowledge, skill, experience, training,

and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801.)

"A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] 'Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.) "The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 247, quoting *Watson*, *supra*, 46 Cal.2d at p. 836.)

Miguel contends that Jones's responses to the prosecutor's hypothetical questions "improperly and repeatedly expressed an opinion on [his] guilt." Assuming arguendo that the prosecutor's hypothetical questions and Jones's responses thereto were erroneous, in their absence, we find no reasonable probability that a result more favorable to Miguel would have been reached. In view of the record (see *ante*, at pp. 32-41), it is still likely that the jury would have convicted him of unlawful transportation of a controlled substance (count 1), unlawful possession of a firearm by a convicted felon (count 3), open carry of a loaded firearm by a nonregistered owner (count 4), and unlawful possession of a controlled substance for sale (count 5) and found true the

allegation that he committed the offenses underlying counts 1 and 5 for the benefit of or in association with the Loma Bakers.[20]

## VII. The trial court properly denied Avendano's and Lizeth's new trial motions.

### a. *Background*

On March 25, 2019, Lizeth's attorney moved for an order "compelling disclosure of exculpatory evidence," namely, fingerprint analysis on "items that were seized inside the backpack" that "have not [yet been] tested." The court deferred its ruling on the motion, commenting that the "jury [was] waiting in the hall." Later, following a recess and outside the jury's presence, Lizeth's attorney advised the court that he "had requested . . . [Officer] Jones to submit the other items that were seized in the backpack for forensic analysis" and "[Jones] indicated he would, given the time frames, taking those into consideration." The prosecutor responded:

> "Your Honor, I don't know what the time frame is going to be. I know that Officer Jones is required to be here approximately seven hours a day. And he also has other work but what he is willing to do for counsel. Counsel did not request until now. It's fine with me as long as it's not expected to happen in a speedy fashion."

On March 27, 2019, Lizeth's attorney stated that Jones informed him "that the forensic analysis on the items in the backpack would be completed within one or two days." He also communicated his intention to request a continuance "in [the] event that the trial gets closed before that evidence is determined . . . ." Later that day, as a result of Jones's testimony on cross-examination, the prosecution's failure to disclose information about certain social media posts was brought to light and the court ordered the prosecution to "turn over to the defense" "any additional information that any witness has obtained from the last report until now . . . ." (See *ante*, at pp. 41-49.) The prosecutor notified the court and defense attorneys that "the process of latent prints and the search

---

[20] Having decided on the merits that the purported error was not prejudicial, we need not address the Attorney General's forfeiture claim.

warrants on the electronics that was requested by [Lizeth's attorney] is in progress." The following colloquy transpired:

> "THE COURT:     Is there a chance we are going to have that tomorrow?
>
> "[PROSECUTOR]:  Possibly, your Honor.
>
> "THE COURT:     So tomorrow morning we will come in and ask you about that again. Communicate with defense counsel about that, as well."

The record indicates that—on the morning of March 28, 2019, the court and counsel discussed jury instructions and Jones's "bury" remark (see *ante*, at p. 21). Jones was also voir dired. However, the parties never raised the matter of forensic testing, evidence thereof was never presented, and Lizeth's attorney did not request a continuance. Later that day, the prosecution and the defense rested.

Following trial, the jury found defendants guilty as charged and found true all special allegations. The verdict was filed on April 2, 2019.

On May 9, 2019, Avendano's attorney filed a motion for new trial pursuant to section 1181, subdivisions 5 and 8. In an accompanying declaration, he averred:

> "On April 29, 2019 I received from the prosecution an extraction report from the data that was located on the black Samsung tablet that was found in the backpack containing the methamphetamine and loaded gun. The extraction report clearly shows that [Miguel] is the owner of the tablet. Also contained within the tablet are electronic conversations that show [Miguel] exercised exclusive dominion over the methamphetamine and gun."

He argued that "the result of the trial would have been different if this evidence had been disclosed to the defense prior to trial."

On May 22, 2019, Lizeth's attorney filed a motion for new trial pursuant to section 1181, subdivisions 5 and 8. In an accompanying memorandum of points and authorities, he specified:

"Defendant Lizeth Aldaco was convicted of all charges by the jury. The trial was assigned to Department T-2 on or about March 19, 2019 and concluded on April 2, 2019. The extraction of the Samsung tablet, conducted by the Bakersfield Police Department, occurred on March 27, 2019. The report was 'created' on April 29, 2019—the same day the prosecutor disclosed the report to defense counsel.

"The owner of the tablet was determined to be defendant Miguel Aldaco, . . . and all of the text messages extracted from the tablet involve him and other persons. The electronic conversations contained within the device show that [Miguel] not only . . . had exclusive dominion and control of the tablet, but also the contraband (firearm and methamphetamine) as [Miguel] was staging a narcotic transaction immediately before the Honda sedan was stopped for an alleged traffic infraction. The text messages of interest were sent and received on the evening of January 24, 2017 between 11:00 p.m. and 12:00 a.m. These text messages and others extracted a few days before the incident date are suggestive of drug trafficking by Miguel Aldaco and others. [¶] . . . [¶]

"Defendant Lizeth Aldaco asserts that failure to disclose exculpatory evidence, such as the extracted contents of the Samsung tablet, amounts to prosecutorial misconduct and constitutes a second ground supporting [her] motion for new trial. . . . [¶] . . . [¶]

"The prosecutor committed prosecutorial error by not disclosing exculpatory evidence to defense counsel in a timely manner. Moreover, it appears that the evidence extracted from the tablet was withheld from the date law enforcement learned of the content of the tablet. The report was not generated until over a month later."[21]

In an accompanying declaration, Lizeth's attorney averred:

"Towards the end of various text messages exchanged by the tablet's owner, Miguel Aldaco, the events taking place immediately before the incident are found. The vehicle stop conducted by Officer . . . Eddy occurred on January 25, 2017 at approximately 12:50 a.m. . . . Miguel Aldaco and a person named Legna Antonio Pena exchange texts beginning at 11:14 p.m. when Miguel Aldaco texts 'let me borrow the car for a bit after.' Pena replies at 11:16 p.m. with 'Ill ask your sis' and Miguel Aldaco replied at 11:19 p.m. with 'Ask her real quick.' . . . Defendant Lizeth Aldaco did not participate in any of these text messages."

---

[21] The motion included portions of the "Extraction Report."

62.

He argued that "[t]he evidence is such as to render a different result probable on a retrial." (Boldface omitted.)

In its opposition, the People asserted that the extraction report was "inculpatory" and "completely consistent with [its] case and argument at trial." The People also argued that there was no *Brady* error.

At the outset of the May 23, 2019 motion hearing, the court indicated that it "reviewed the motions and the opposition." After counsel reiterated their arguments, the court ruled:

> "Okay, my recollection of what was happening at trial is that it was the defense request that led to that all happening. . . . [I]t appears to me now and it appeared to me then that everyone was playing a strategical game here, if you want to look at it that way, including the defense.

> "I find there's no prosecutorial [mis]conduct here and I'm going to deny the motion for new trial."

b. *Standard of review*

" 'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.' [Citations.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 140.) " ' "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." ' [Citations.]" (*Ibid.*) "Although this standard of review is deferential, 'it is not empty . . . . [I]t asks in substance whether the ruling in question "falls outside the bounds of reason" under the applicable law and the relevant facts [citations].' [Citation.]" (*People v. Andrade* (2000) 79 Cal.App.4th 651, 659.) "The appellant has the burden to demonstrate that the trial court's decision was 'irrational or arbitrary,' or that it was not ' "grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." [Citation.]' [Citations.]" (*Ibid.*)

"We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence."  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176, citing *People v. Salazar* (2005) 35 Cal.4th 1031, 1042 (*Salazar*).)

c.  *Analysis*

Section 1181 provides, in pertinent part:

"When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only:  [¶] . . . [¶]

"5.  When the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial, and when the district attorney or other counsel prosecuting the case has been guilty of prejudicial misconduct during the trial thereof before a jury; [¶] . . . [¶]

"8  When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. . . ."

We find that the court did not abuse its discretion when it denied Avendano's and Lizeth's new trial motions.

i.  <u>*Brady* error</u>

Citing *Brady*, Avendano and Lizeth contend that "the failure of the prosecution to turn over the extraction information before the trial was over was improper and violated [their] rights of due process and a fair trial."

"In *Brady*, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'  [Citation.]  The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence was well as exculpatory

64.

evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation]. Such evidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' [Citation.] In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' [Citations.]" (*Salazar*, *supra*, 35 Cal.4th at p. 1042.)

" 'There are three components of a . . . *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' [Citation.] Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt or innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result." ' [Citation.]" (*Salazar*, *supra*, 35 Cal.4th at p. 1043.) "The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court. [Citations.] It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.]" (*In re Sassounian* (1995) 9 Cal.4th 535, 544.)

The record indicates that the prosecution relied on evidence of an uncharged conspiracy among defendants to prove derivative criminal liability. That the extraction report tends to attribute ownership of the backpack and its contents—e.g., the methamphetamine and loaded firearm—to Miguel does not refute the prosecution's theory and does not establish a probability sufficient to undermine confidence in the

jury's verdict. (Cf. *People v. Martinez* (1984) 36 Cal.3d 816, 823 [the defendant's new trial motion proffered newly discovered evidence that "reopen[ed] [a] critical gap in the prosecution's chain of proof"].) Without the materiality and prejudice needed to establish a *Brady* violation, we uphold the court's finding that there was "no prosecutorial [mis]conduct."

### ii. Newly discovered evidence

" ' "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' " ' [Citation.]" (*People v. O'Malley* (2016) 62 Cal.4th 944, 1016-1017.)

We cannot conclude that a different result is probable on retrial in light of the extraction report. As mentioned, while the report tends to attribute ownership of the backpack and its contents to Miguel, this does not undercut the prosecution's theory that all three defendants conspired to commit the charged crimes and were therefore liable for each other's acts. (See *People v. Martinez*, *supra*, 36 Cal.3d at p. 823.)

Avendano and Lizeth question the brevity of the court's ruling. Although the ruling "was stated succinctly, we infer from the record of the hearing itself that the court properly 'discharge[d] [its] duty to conscientiously consider [the] motion for new trial . . . . The hearing transcript reveals that [the court] was well acquainted with the briefs . . . and carefully considered those claims before denying the motion.' [Citation.]" (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1063.)

## VIII. There was no cumulative error.

Each defendant contends the cumulative effect of the purported errors requires reversal of the convictions. "[A] series of trial errors, though independently harmless,

may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) "A claim of cumulative error is in essence a due process claim . . . ." (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) " 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*Ibid*.) "[T]he reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to [the] defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) Having reviewed and analyzed each alleged error, we cannot conclude that the cumulative effect was such that defendants were deprived of due process and a fair trial. Therefore, we reject their arguments.

## IX.  In view of Assembly Bill No. 333, the gang enhancements on counts 1 and 5 must be vacated.

a. *Background*

Avendano's attorney moved in limine to bifurcate the trial of the gang enhancement from the trial of the charged offenses. He argued:

> "Well, when it comes to gang evidence, every case I've seen classifies it as being highly inflammatory, just the nature of it alone, no matter what the underlying facts are. People don't like gangs. People are scared of gangs. And when you have a criminal case and you have the presumption of innocence, it's hard for someone to hear about a gang even when this person is a member of a gang, they think about tattoos, would they still be fair and impartial on everything else?

> "And so the real risk in this case is, you don't want the jury to go backwards and say okay, he is a gang member. Gang member[s] do all sorts of crimes, including murder. He did this. It needs to be the other way. This isn't an enhancement. That's something that's charged. They are charged with possession, without talking about the person's tattoos and what they mean, or where this person grew up and other inflammatory aspects. That's why I believe the facts of this case would warrant bifurcation.

> "I can understand if this was a gang shooting or something along those lines where it's kind of connecting or interwoven into the facts.

67.

"But when you have a vehicle stop and it's possession, and the People's argument is he is a gang member, pretty much is a bad person, in a bad neighborhood, therefore, it must be his, or gang members do this, and it's pure speculation about everything they have been talking about this gang member mentality, if it even exists, again, they're hiding the substantive charge of the participating issue of a gang.

"All you have is just trying to inflame the jury of their passion, their prejudice, their fears. And then saying okay, let's get this dangerous person off the street. And so that's the risk you run in this case. And so that's why I'm asking for bifurcation."

Miguel's attorney and Lizeth's attorney echoed similar claims.

The prosecutor countered that the gang evidence was "particularly integral to this particular case." He explained:

"Well, in order to get the determination of guilt, I have to convince twelve jurors good and true that all three of these individuals knew about the drugs, knew that they were possessed for the purpose of sale, and, in fact, had custody or control over those drugs.

"My method of doing that is to prove that three people acting all for the benefit and in association with the Loma Bakers, were doing this as a group. If I lose that, that essentially takes away the adhesion I have between the backpack where the contraband was located and all three individuals.

"Mr. Avendano's attorney can say it must have been Ms. Aldaco's drugs because it's her car. And Mr. Aldaco can say it must have been Mr. Avendano's because he was the one who was driving. Or either one of them can say it must have been Mr. Aldaco's because he was the one in the backseat where the drugs were found.

"When I call a witness to explain how gangs work and the fact that they work together to commit crimes, things like the presence of the backpack in one place, somebody having money in another place, . . . all these things start to make since [sic]. You see this as a gang working together, working to benefit the Loma Bakers. I can't get them and tie them to the drugs in the first place without that."

The court subsequently remarked:

"Well, my tentative indication to deny bifurcation comes with the implicit and now explicit belief that there is some probative value regarding

68.

motive, intent, et cetera.  And that even if I were to bifurcate . . . , there would still be probative value of that evidence, that exact same evidence, vis-a-vis the principle [*sic*] charges. . . .”

Ultimately, the court denied the bifurcation motion.

Prior to closing arguments, the court instructed the jury, in part:

“You may consider evidence of gang activity only for the limited purpose of deciding whether:

“The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and allegations charged;

“OR

“The defendant had a motive to commit the crimes charged.

“You may also consider this evidence when you evaluate the facts and information relied on by an expert witness in reaching an opinion.

“You may not consider this evidence for any other purpose.  You may not conclude from this evidence that the defendant is a person of bad character or that he or she has a disposition to commit crime.  [¶] . . . [¶]

“If you find the defendant guilty of the crimes charged in Count 1 or Count 5, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant committed that crime for the benefit of, or in association with, a criminal street gang.  You must decide whether the People have proved this allegation for each crime on which you have made a determination of guilt, and return a separate finding for each such crime.

“To prove this allegation, the People must prove that:

“1.    The defendant committed the crime for the benefit of, or in association with, a criminal street gang;

“AND

“2.    The defendant intended to assist, further, or promote criminal conduct by gang members.

“The ‘Loma Bakers’ is a criminal street gang.

"The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (Accord, CALCRIM Nos. 1401, 1403.)

After defendants were convicted and sentenced, but while this case was still pending on appeal, the Legislature enacted Assembly Bill No. 333, which amended section 186.22 and added section 1109 (Stats. 2021, ch. 699, §§ 3, 5). The new laws became effective on January 1, 2022. (See Cal. Const., art. IV, § 8, subd. (c)(1); Gov. Code, § 9600, subd. (a).)

b. *Analysis*

i. Section 1109

Section 1109, subdivision (a) provides:

"If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows: [¶] (1) The question of the defendant's guilt of the underlying offense shall be first determined. [¶] (2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence."

Defendants make two contentions. First, section 1109 applies retroactively "because it makes a procedural change that benefits defendants, providing a possibility of a more favorable outcome – acquittal or deadlock in a guilt phase trial without prejudicial gang evidence." Second, the trial court's failure to bifurcate was prejudicial under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). On the other hand the Attorney General asserts: (1) section 1109 "is prospective in nature"; and (2) even if section 1109 is retroactive, the trial court's denial of the bifurcation motion was harmless under *Watson*, *supra*, 46 Cal.2d at p. 836. Assuming arguendo that section 1109 applies

70.

retroactively, defendants "cannot show it is 'reasonably probable' [they] would have obtained a more favorable result if [their] trial had been bifurcated." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480, citing *Watson*, at p. 836; see *People v. Burch* (2007) 148 Cal.App.4th 862, 868-869 [trial court's denial of bifurcation request harmless under *Watson*]; see also *People v. Gonzales* (2011) 51 Cal.4th 894, 924 [exercise of discretion under Evid. Code, § 352 subject to *Watson* standard].)

The California Supreme Court has held that—in cases not involving the gang enhancement—"evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal." (*Hernandez*, *supra*, 33 Cal.4th at p. 1049.) However, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Ibid.*; see *People v. Montes* (2014) 58 Cal.4th 809, 859 ["While gang membership evidence does create a risk the jury will impermissibly infer a defendant has a criminal disposition and is therefore guilty of the offense charged [citation], 'nothing bars evidence of gang affiliation that is directly relevant to a material issue.' "].) As noted, in the instant case, the record indicates the prosecution relied on evidence of an uncharged conspiracy among defendants to prove derivative criminal liability, which is proper. (*People v. Valdez*, *supra*, 55 Cal.4th at p. 150.) Since " ' " '[t]he existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy' " ' " (*People v. Dalton*, *supra*, 7 Cal.5th at p. 244) and "common gang membership may be part of circumstantial evidence supporting the inference of a conspiracy" (*People v. Superior Court (Quinteros)*, *supra*, 13 Cal.App.4th at p. 20), the prosecution introduced evidence that defendants were members of the Loma Bakers at the time of the January 25, 2017

incident and committed the charged offenses for the benefit of or in association with the gang to support its theory. (See *People v. Pettie* (2017) 16 Cal.App.5th 23, 45 ["[E]vidence of defendants' gang membership was relevant to show their state of mind regarding the consequences of the conspiracy."]; *People v. Franklin* (2016) 248 Cal.App.4th 938, 953 ["The gang evidence here was thus relevant to the prosecution's theory of motive."].) "[M]uch of the evidence related to the gang enhancement would have been admissible in a separate trial of the [substantive offenses]." (*People v. Garcia*, *supra*, 244 Cal.App.4th at p. 1358.) "To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled . . . ." (*Hernandez, supra*, at pp. 1049-1050.)

Moreover, the court instructed the jury that it (1) "may consider evidence of gang activity only for the limited purpose of deciding whether" a defendant "acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and allegations charged" or "had a motive to commit the crimes charged"; and (2) "may not consider this evidence for any other purpose," such as "conclud[ing] from this evidence that [a] defendant is a person of bad character or that he or she has a disposition to commit crime." (Accord, *People v. Pettie*, *supra*, 16 Cal.App.5th at pp. 41-42.) "We presume that the jury followed these limiting instructions, and there is nothing in this record to rebut that presumption." (*People v. Franklin*, *supra*, 248 Cal.App.4th at p. 953; see *Pettie*, *supra*, at p. 45.)[22]

    ii.  Section 186.22

Amended subdivision (g) of section 186.22 now reads:

"[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than

---

[22] We had deferred Lizeth's request for judicial notice of legislative history pending consideration of this appeal on its merits. In light of our disposition, we deny the request.

reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

Defendants again make two contentions. First, the amended section 186.22 applies retroactively. Second, the gang enhancements must be vacated because section 186.22, subdivision (g) "redefines the enhancement in a manner the jury was not instructed." The Attorney General concedes that "[t]he recent amendments to section 186.22 apply retroactively to appellants" but maintains that "remand is unnecessary" because while "the People presented some evidence of the reputational benefit the gang achieves from possessing drugs for sale and gun possession, it also presented overwhelming evidence of common benefits to gang members that are more than reputational, i.e., the gang's financial gain from drug sales and possessing a firearm to protect the drug sale activity."

"By requiring proof for a gang enhancement that the benefit to the gang was more than reputational, Assembly Bill No. 333 essentially adds a new element to the enhancement. When jury instructions are deficient for omitting an element of an offense, they implicate the defendant's federal constitutional rights, and we review for harmless error under the strict standard of *Chapman* . . . . [Citations.] . . . Under the *Chapman* standard, reversal is required unless 'it appears beyond a reasonable doubt that the error did not contribute to th[e] jury's verdict.' [Citation.]" (*People v. Sek* (2022) 74 Cal.App.5th 657, 668.) "[I]t is not enough to show that substantial or strong evidence existed to support a [true finding] under the correct instructions." (*Ibid.*) Here, "[a]lthough there was a great deal of evidence of benefits to the gang that went beyond reputational, we cannot rule out the possibility that the jury relied on reputational benefit to the gang as its basis for finding the enhancements true. Thus, the instructional error on this question was not harmless under the *Chapman* standard." (*Id.* at p. 669.) " 'We

therefore conclude that the gang-related enhancement findings must be vacated and the matter remanded to give the People the opportunity to prove the applicability of the enhancements under the amendments to section 186.22.' [Citation.]" (*People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1033; see *People v. Sek*, *supra*, at p. 669; see also *In re D.N.* (2018) 19 Cal.App.5th 898, 902 [double jeopardy is not implicated when the prosecution makes its case under the law as it stood at trial]; *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand."].)

## **DISPOSITION**

The gang enhancements on counts 1 and 5 are reversed. The matter is remanded back to the trial court for further proceedings. Following retrial on the enhancements, or if the People elect not to retry the enhancements, the trial court shall resentence defendants and prepare an amended abstract of judgment in a manner consistent with this disposition and forward copies of the amended abstract to the appropriate law enforcement and custodial officials. In all other respects, the judgment is affirmed.

DETJEN, Acting P. J.

WE CONCUR:

SMITH, J.

SNAUFFER, J.

74.